1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No.  03-cv-907-BEN (WMC) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| | ) | |
| | ) | |
| | ) | |
| ROBERT I. BOURSEAU, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

To paraphrase Justice Oliver Wendell Holmes, Jr., "hospital operators must turn square corners when dealing with the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services."[1] This is an action brought by the United States Government against two psychiatric hospital operators for cutting corners or claiming to have turned square corners that did not actually exist.[2]  The hospital operators are Mr. Robert I. Bourseau and Dr.

_____

[1] "Men must turn square corners when dealing with the government." Rock Island, Ark. & La. R.R. v. United States, 254 U.S. 141, 143 (1920) (Holmes, J.).

[2] The Defendants defense to the Government's claim is essentially that the Medicare reimbursement statutes and regulations are sufficiently vague that their claims for payment cannot be deemed false claims.  In other words, to again paraphrase, before a hospital operator can be penalized for not turning square corners, "it is crucial that they know where those corners are."  Waxman, Seth P. and Fried, Charles, Motion for Leave to File Brief as *Amici Curiae*, Northwest Airlines, Inc. v. Spirit Airlines, Inc., U.S. Supreme Court Case No. 06M7, On Petition for Writ of Certiorari (Filed Aug. 17, 2006).

1   Rudra Sabaratnam, and their two single-employee corporations, RIB Medical Management

2   Services, Inc. and Navatkuda, Inc.

3          The Government seeks damages flowing from the presentment of false claims under the

4   federal False Claims Act ("FCA"), 31 U.S.C. §§3729-3733, and under California state causes of

5   action for unjust enrichment and common law fraud.  The asserted false claims were presented as

6   Medicare reimbursable costs.  The costs were itemized in three annual "cost reports" submitted by

7   California Psychiatric Management Services ("CPMS"), which was doing business as Bayview

8   Hospital & Mental Health Systems ("CPMS/Bayview Hospital" or "Bayview").  The costs were

9   claimed as incurred for the treatment of Medicare patients at a psychiatric hospital in Chula Vista,

10  California.  The cost reports were submitted for the hospital's operations during the years 1997,

11  1998, and 1999.  CPMS went into Bankruptcy twice: once in 1996 (emerging in 1998) and again in

12  2000.  The Government has also filed creditor claims directly against CPMS in the 2000 CPMS

13  bankruptcy case (which is still pending at this time).

14         A six day bench trial was held in July 2006 and having considered the evidence, the Court

15  makes the following factual and legal findings.[3]

16                        **I.  FINDINGS OF FACT**

17  **A.     Entities**

18  1.     Plaintiff is the United States and brings this suit on behalf of the United States Department

19         of Health and Human Services, Centers for Medicare and Medicaid Services, which

20         administers the Medicare Program.

21  2.     Bayview Hospital & Mental Health Systems, a psychiatric hospital in Chula Vista,

22         California, was owned and operated by California Psychiatric Management Services

23         (CPMS).

24  3.     CPMS was a California Limited Partnership with two general partners: RIB Medical

25         Management Services, Inc. and  Navatkuda, Inc.

26  4.     Robert I. Bourseau (Bourseau) served as President and the only employee of RIB Medical

27         Management Services, Inc.  Bourseau controlled RIB.

28

---

[3] Some of the factual findings are contained in the Pre-Trial Order (signed May 5, 2006) and
were stipulated to by both parties prior to the trial.

5.    Dr. Rudra Sabaratnam (Sabaratnam), a licensed physician, served as President and the only full-time employee of Navatkuda, Inc.  Dr. Sabaratnam controlled Navatkuda.

6.    Bourseau focused on operations management while Dr. Sabaratnam focused on medical management.

7.    Together, Bourseau and Dr. Sabaratnam, through RIB and Navatkuda, ran CPMS doing business as Bayview  Hospital.

8.    Bourseau signed CPMS/Bayview Hospital's 1997, 1998, and 1999 cost reports certifying that the reports were true, correct, and complete statements prepared from CPMS/Bayview Hospital's books and records in accordance with applicable instructions and that he was familiar with the laws and regulations regarding the provision of health care services, and that the services identified in the cost reports were provided in accordance with those laws and regulations.

9.    While Dr. Sabaratnam focused on medical care at Bayview Hospital, he was familiar with the process of preparing and submitting hospital cost reports to Medicare.  Prior to the submission of CPMS's 1997, 1998, and 1999 cost reports, Dr. Sabaratnam signed a hospital cost report for a hospital in Los Angeles, California (Ingleside Hospital).

**B.    The Medicare Program**

10.    The United States administers the hospital insurance benefits program for the aged and disabled, commonly referred to as "Medicare Part A."  42U.S.C. §§ 1395c – 1395i-5.  The Medicare program was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. §§ 1395–1395ggg).

11.    The agency of the United States responsible for the Medicare program is the United States Department of Health and Human Services (HHS).  *See, e.g.,* 42 U.S.C. §§ 1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r, 1395u.  The agency within HHS administering the program is the Centers for Medicare & Medicaid Services  which prior to July 1, 2001, was known as the Health Care Financing Administration.  Notice, 66 Fed. Reg. 35437 (2001).

12.    Medicare Part A provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care.  42 U.S.C. § 1395c.  Benefits include services provided by psychiatric hospitals.  42 U.S.C. § 1395d(c).

13. When electing to participate in the Medicare program, the provider enters into a contract with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare reimbursement, including the provisions of Section 1866 of the Social Security Act and Title 42 of the Code of Federal Regulations.

**C.** **Before CPMS' 1996 Bankruptcy**

14. Between November 1991 and 1995, CPMS entered into contracts to manage psychiatric units in five hospitals in the Los Angeles, California area:  South Bay Hospital, Mission Hospital (San Fernando Hospital and Panorama Hospital), L.A. Metro Hospital, and Bellflower Hospital (the five Los Angeles Hospitals).

15. Pursuant to the management contracts with the five Los Angeles hospitals, CPMS agreed to provide management services for these hospital psychiatric units.

16. Each Los Angeles hospital submitted its own cost report to Medicare that included expenses for its psychiatric unit.

17. Each of the psychiatric units was housed in the respective Los Angeles hospitals.

18. Beginning in June 1993, CPMS entered into a series of financing arrangements with National Century Financial Enterprises, Inc. and its subsidiaries and affiliates, including but not limited to National Premier Financial Services, Inc. and its affiliates (collectively NCFE), in connection with CPMS' management of the psychiatric units in the Los Angeles hospitals.

19. CPMS leased the hospital buildings and campus known as Bayview Hospital in August 1994.

20. In or around September 1994, HHS-CMS accepted CPMS/Bayview Hospital's request to participate as a psychiatric hospital in the Medicare program.  CPMS/Bayview Hospital's Provider Agreement was signed in August and September 1994.  In its agreement with HHS-CMS, CPMS/Bayview Hospital agreed to conform to the provisions of Section 1866 of the Social Security Act and Title 42 of the Code of Federal Regulations.

21. CPMS/Bayview Hospital's Provider Agreement was terminated effective November 29, 2000.

22. Sometime prior to 1995, CPMS became engaged in litigation with the five Los Angeles Hospitals, and by 1995 all of the management agreements were terminated by those hospitals.

23. CPMS filed Home Office Cost Statements for 1994, 1995, and 1996, and identified as separate chain components of CPMS the following entities - Bayview Hospital, LA Metro, San Fernando, South Bay, Bellflower, and Panorama.

**D.    CPMS' 1996 Bankruptcy**

24. On April 9, 1996, CPMS, voluntarily filed a petition in the United States Bankruptcy Court for the Central District of California under Chapter 11 of the Bankruptcy Code (Reorganization) (the 1996 Bankruptcy).

25. At the time of the 1996 Bankruptcy, National Century Financial Enterprises, Inc. and its subsidiaries and affiliates, including National Premier Financial Services, Inc. and its affiliates (collectively NCFE), claimed that CPMS was indebted to it in excess of $12 million.

26. In or around March 1998, the bankruptcy court approved a reorganization plan for CPMS which, among other things, gave NCFE a 49.9 % limited partnership interest in CPMS.

27. As a result of NCFE acquiring a 49.9% limited partnership interest in CPMS in March 1998, CPMS and NCFE became "related parties" as that term is used in the Medicare regulations.

**E.    Pacific Hospital Management and Mutual of Omaha**

28. Before 1997, CPMS retained Pacific Hospital Management (PHM), Oakland, California, to prepare and transmit to Medicare, on CPMS's behalf, CPMS's cost reports.  The PHM consultants handling the CPMS account were Paul Fayollat and Loretta Masi.

29. Fayollat had provided cost report preparation services to Bourseau or Dr. Sabaratnam since 1986.

30. The 1997, 1998, and 1999 Medicare cost reports for CPMS (Bayview Hospital) were preliminarily prepared by consultant Fayollat.  Fayollat ultimately transmitted the cost reports to the Medicare fiscal intermediary.

31. Mutual of Omaha Insurance Company (Mutual of Omaha) was the fiscal intermediary (FI) responsible for paying or reimbursing CPMS for CPMS/Bayview Hospital  Medicare services and reviewing cost report accuracy and Medicare program compliance.

32. Cost reports are like income tax returns in that they are submitted by Medicare providers in the year following the year in which expenses were incurred and aggregate the Medicare costs incurred for the entire reporting  year.  CPMS submitted its 1997 cost report (for all costs incurred during the 1997 calendar year) in the spring of 1998.

33. Neither Bourseau nor Dr. Sabaratnam submitted false or reckless claims on the assumption that the fiscal intermediary would catch and correctly calculate the values in the review process.

**F.** **CPMS/Bayview Hospital's 1997 Cost Report –**

**Claimed Interest and Bankruptcy Professional Fees**

34. For CPMS/Bayview Hospital, Fayollat's firm prepared a preliminary 1997 cost report in May 1998.  The preliminary 1997 cost report showed that CPMS would owe Medicare more than $1 million in Medicare overpayments made during 1997.

35. A meeting then took place around May 18, 1998, attended by Bourseau and Dr. Sabaratnam, Seth Morriss (CPMS' Director of Finance), and the consultants Fayollat and Masi.

36. One purpose of the May 18, 1998 meeting was to discuss ways to reduce the overall amount owed to Medicare.

37. One topic discussed at the meeting was whether some or all of the interest owed to NCFE, flowing from loans made to CPMS in earlier years, should be included on its 1997 cost report.

38. Another topic discussed at the meeting was whether some or all of the bankruptcy fees incurred by CPMS, should be included on its 1997 cost report.

39. Fayollat's professional judgment was that Medicare would disallow interest and bankruptcy legal fees unrelated to CPMS's operation of Bayview Hospital, since Bayview Hospital was the only avenue through which CPMS provided services to Medicare patients during the year 1997.

40.   Fayollat advised Bourseau and Dr. Sabaratnam that the amounts that could be properly included in the CPMS/Bayview Hospital cost report would be limited to the amounts related to patient services at Bayview Hospital.

41.   Fayollat also advised Bourseau and Dr. Sabaratnam in May 1998 that Medicare would not pay for expenses unrelated to Bayview Hospital that were included in the CPMS/Bayview Hospital cost report, and consequently that it was improper to include the full amount of the interest and bankruptcy legal fees in the 1997 CPMS/Bayview Hospital cost report.

42.   Fayollat advised defendants that:  (1) if it were up to him, he would not include interest and bankruptcy fees unrelated to Bayview Hospital in CPMS/Bayview Hospital's cost reports; and (2) Medicare would not pay for such expenses.

43.   Notwithstanding Fayollat's advice, Bourseau directed Fayollat to include the total amount of the interest from 1997 ostensibly charged CPMS by NCFE ($2,550,722) and all of CPMS' bankruptcy legal fees incurred in 1997 ($1,303,383) on the CPMS/Bayview Hospital 1997 submitted cost report.

44.   Bourseau made the decision to include the NCFE interest and bankruptcy legal fees with specific knowledge that none of the claimed interest expense incurred had been actually paid by CPMS, and that much of the claimed interest and much of the bankruptcy fees incurred originated from and were related to operations other than Bayview Hospital.  These claims were submitted to the Government with knowledge or with reckless disregard as to their falsity.

45.   With reckless disregard, Dr. Sabaratnam agreed with Bourseau's directive to Mr. Fayollat to include the full amount of the interest ostensibly charged CPMS by NCFE ($2,550,722) and all of CPMS's bankruptcy legal fees ($1,303,383) on the CPMS/Bayview Hospital 1997 submitted cost report.

46.   The CPMS/Bayview Hospital 1997 cost report finally submitted to the Medicare fiscal intermediary included the full amount of interest ostensibly charged to CPMS by NCFE, and all of CPMS' bankruptcy legal fees.

47.   The 1997 Medicare cost report filed by CPMS/Bayview Hospital included $2,550,722 in interest charged to CPMS by NCFE.

48.    The 1997 Medicare cost report filed by CPMS/Bayview Hospital included $1,303,383 in bankruptcy professional fees.

49.    No more than $405,000 of the $2,550,772 in interest claimed in CPMS/Bayview Hospital's 1997 cost report may have possibly related to debt incurred for the operation of Bayview Hospital. The balance related to debt incurred by CPMS (prior to its first bankruptcy in 1996) while managing the psychiatric units in the five Los Angeles Hospitals which CPMS managed between 1993 and 1995.

50.    No more than $443,239 of the $1,303,383 in bankruptcy legal fees claimed in CPMS/Bayview Hospital's 1997 cost report actually related to the operation of Bayview Hospital. The balance related to debts and disputes arising between CPMS and other creditors or debtors while managing the psychiatric units in the five Los Angeles Hospitals which CPMS managed between 1993 and 1995.

51.    Neither in 1997, nor in 1998, did CPMS actually pay to NCFE any of the $2,550,772 interest claimed on CPMS/Bayview Hospital's 1997 cost report – whether it related to patient care at Bayview Hospital or to CPMS' pre-Bayview management services for the Los Angeles hospitals.

52.    The 1997 interest was not identified in Bayview Hospital's internal accounting records in 1997.

**G.    CPMS/Bayview Hospital's 1998 Cost Report**

53.    For CPMS/Bayview Hospital, Fayollat's firm prepared a preliminary 1998 cost report in May 1999. The preliminary 1998 cost report showed that CPMS would owe Medicare a substantial amount from Medicare overpayments made during 1998.

54.    A meeting took place around May 18, 1999, attended by Bourseau and Dr. Sabaratnam, Seth Morriss (CPMS' Director of Finance), and the consultants Fayollat and Masi.

55.    One purpose of the May 18, 1999 meeting was to discuss ways to reduce the overall amount that would be owed to Medicare upon submission of the 1998 cost report.

**i.    Claimed Interest**

56.    Bourseau and Dr. Sabaratnam wanted all interest (approximately $2.7 million) ostensibly charged CPMS by NCFE claimed on CPMS/Bayview Hospital's 1998 cost report.

57. Fayollat advised Bourseau and Dr. Sabaratnam that in his view interest expenses for money borrowed for purposes unrelated to CPMS/Bayview Hospital were not reimbursable from Medicare.

58. Bourseau and Dr. Sabaratnam did not follow Fayollat's advice.

59. With reckless disregard, Bourseau made the decision to direct Fayollat to include all of the interest expense ostensibly owed to NCFE on CPMS/Bayview Hospital's 1998 cost report.

60. With reckless disregard, Dr. Sabaratnam agreed with Bourseau's directive to Fayollat to include the full amount of claimed NCFE interest on CPMS/Bayview Hospital's 1998 cost report.

61. The 1998 Medicare cost report filed by CPMS/Bayview Hospital included $2,761,803 in interest ostensibly owed by CPMS to NCFE.  None of the interest was actually paid to NCFE by CPMS during the year 1998, or the year 1999.

62. Only $547,756 of the $2,761,803 in interest claimed to have been incurred related to debt incurred for operating Bayview Hospital; $2,214,047 of the ostensible interest accrued related to debt incurred for the Psychiatric Units in the five Los Angeles Hospitals CPMS managed between 1993 and 1995.

63. Bourseau asserts that the 1997 accrued interest and part of the 1998 accrued interest was, in fact, paid by CPMS in 1999.  However, his testimony and the single supporting contemporaneous document (an e-mail note) is unconvincing.  Instead, what was described appears to have been a $4,000,000 paper loan without substance from NCFE to Defendants, to various of Defendant's entities, and back to NCFE as a much smaller credit against CPMS' debt to NCFE – which NCFE later characterized not as a credit towards CPMS's past debt but as a partial repayment by CPMS to NCFE of the new 1999 NCFE loan – and the balance of which was never actually paid by CPMS or credited on behalf of CPMS prior to CPMS's second bankruptcy (in 2000).

### ii.     Bankruptcy Professional Fees

64. As with the bankruptcy legal fees in CPMS/Bayview Hospital's 1997 cost report, Fayollat advised Bourseau and Dr. Sabaratnam that only those fees related to the operation of

1    Bayview Hospital should be included in CPMS/Bayview Hospital's 1998 cost report.

2    Bourseau and Dr. Sabaratnam did not follow Fayollat's advice.  With reckless disregard,

3    Bourseau and Dr. Sabaratnam decided to place in CPMS/Bayview Hospital's 1998 cost

4    report all of the bankruptcy legal fees ($180,000) CPMS paid including fees unrelated to the

5    operation of Bayview Hospital.

6    65.   The Defendants' reckless disregard is best illustrated by Bourseau's own testimony at trial.

7    In response to questioning about the propriety of including all of the bankruptcy fee costs as

8    Medicare expenses claimed on CPMS' cost report, Bourseau testified that Fayolatt "*told me*

9    *it was aggressive, but I still insisted because that was the only way we could get it paid.*"

10   **iii.   Claimed Lease Expense**

11   66.   During the May 12, 1999 meeting, Bourseau directed Fayollat to add to CPMS/Bayview

12   Hospital's 1998 cost report a rent expense of $396,209 for a lease ostensibly with another

13   entity controlled by Bourseau and Dr. Sabaratnam known as Intercare Resources.

14   67.   With knowledge of its falsity, Bourseau and Dr. Sabaratnam directed that the fictitious rent

15   expense be included in CPMS/Bayview Hospital's 1998 cost report.

16   68.   There never was such a lease.  The rent expense was fictitious.

17   **iv.   Square Footage**

18   69.   Also during the May 12, 1999 meeting, with reckless disregard, Bourseau directed and Dr.

19   Sabaratnam agreed to have Fayollat increase the square footage reported in CPMS/Bayview

20   Hospital's 1998 cost report by approximately 16,900 square feet, ostensibly for a partial

21   hospitalization program.

22   70.   CPMS/Bayview Hospital's 1998 cost report did include 16,965 additional square feet for a

23   partial hospitalization program.

24   71.   Very little of the additional square footage included in CPMS/Bayview  Hospital's 1998 cost

25   report was actually used for Medicare patient care or operational support during the year

26   1998.

27   **v.   Management Fees**

28   72.   CPMS/Bayview Hospital's 1998 cost report included $600,000 in management fees.

73. The management fees included in CPMS/Bayview Hospital's 1998 cost report reflected payment of $20,000 per month each to RIB, Navatkuda, and an NCFE entity.

74. Bourseau and Dr. Sabaratnam did actually perform management services for CPMS's Bayview Hospital operations during 1998.  There was no evidence that the amount of management fees paid to Bourseau and Dr. Sabaratnam were substantially out of line with what other psychiatric hospital managers in Southern California were being paid.

75. No Bayview Hospital management was actually performed by NCFE.

76. Bourseau and Dr. Sabaratnam, with knowledge of its falsity, directed that $200,000 be included as NCFE management fees on the CPMS/Bayview Hospital's 1998 cost report.

**H.      CPMS/Bayview Hospital's 1999 Cost Report**

     **i.      Bankruptcy Legal Fees**

77. As with the bankruptcy legal fees in CPMS/Bayview Hospital's 1997 cost report, Fayollat advised Bourseau and Dr. Sabaratnam that only those fees related to Bayview Hospital should be included in CPMS/Bayview Hospital's 1999 cost report.  Bourseau and Dr. Sabaratnam did not follow Fayollat's advice.  With reckless disregard, Bourseau and Dr. Sabaratnam decided to include in CPMS/Bayview Hospital's 1999 cost report all of CPMS' bankruptcy legal fees ($94,666).

     **ii.      Inflated Space**

78. With reckless disregard, Bourseau directed and Dr. Sabaratnam agreed to have Fayollat continue to include the increased square footage reported in CPMS/Bayview Hospital's 1999 cost report of approximately 16,900 square feet, ostensibly for a partial hospitalization program.

79. Very little of the additional square footage was used for patient care during the year 1999.

     **iii.      Management Fees**

80. CPMS/Bayview Hospital's 1999 cost report included $630,000 in management fees.

81. The management fees included in CPMS/Bayview Hospital's 1999 cost report reflected payment of $20,000 per month each to RIB, Navatkuda, and an NCFE entity.

82. Bourseau and Dr. Sabaratnam did actually perform management services for CPMS's Bahyview Hospital operations during 1999.  There was no evidence that the amount of management fees paid to Bourseau and Dr. Sabaratnam were substantially out of line with what other psychiatric hospital managers in Southern California were being paid.

83. No Bayview Hospital management was actually performed by NCFE.

84. Bourseau and Dr. Sabaratnam, with knowledge of its falsity, directed that $240,000 be included as NCFE management fees on the CPMS/Bayview Hospital's 1999 cost report.

### iv.     Program Costs/Claimed Interest

85. CPMS/Bayview Hospital's 1999 cost report included a $336,899 expense listed as "program costs."  This claim was for additional interest accrued and ostensibly payable to an NCFE entity.

86. NCFE was related to CPMS/Bayview Hospital since it was a 49.9% owner of CPMS.

87. The claimed interest was not actually paid by CPMS to NCFE in 1999 or 2000.

88. With reckless disregard, Bourseau made the decision to sign and submit the cost report including the interest expense accrued, but not paid, and ostensibly owed to NCFE, as "program costs" on CPMS/Bayview  Hospital's 1999 cost report.

89. With reckless disregard, Dr. Sabaratnam agreed with Bourseau's decision to sign and submit the CPMS/Bayview  Hospital 1999 cost report including the interest expense accrued, but not paid, and ostensibly owed to NCFE, as "program costs."

### I.     CPMS' Second Bankruptcy

90. On June 9, 2000, CPMS filed for bankruptcy for the second time.

91. To date, the government has recovered nothing on its claim in CPMS' second bankruptcy, which is still pending.

### J.     Overpayments Not Refunded

92. CPMS has not refunded to Medicare overpayments it received from Medicare during 1997 through 1999.

### K.     Damages and Penalties

93. Damages are as follows:

| Year | False Claim Submitted | Damage |
|------|----------------------|--------|
| 1997 | Interest Claimed But Never Paid | $2,550,722 |
|      | Unrelated Bankruptcy Legal Fees | $860,144 |
| 1998 | Interest Claimed But Never Paid | $2,761,803 |
|      | Unrelated Bankruptcy Legal Fees | $112,303 |
|      | Management Fees to NCFE | $180,000 |
|      | Non-Existent Lease Expense | $414,618 |
|      | Inflated Square Footage Effect on Reimbursement | $279,899 |
| 1999 | Unrelated Bankruptcy Legal Fees | $ 53,535 |
|      | Management Fees to NCFE | $240,000 |
|      | Inflated Square Footage Effect on Reimbursement | $135,521 |
|      | Program Costs (Interest Claimed But Never Paid) | $336,899 |
| Total |  | $7,925,444 |

**M.   Findings on Defendants' Affirmative Defenses**

94.   CPMS/Bayview Hospital's 1997 cost report was submitted no earlier than June 5, 1998.

95.   There has been no conscious decision by any authorized agent of the United States permanently to abandon a right of recovery against defendants.

96.   The United States seeks to recover money wrongfully paid from Medicare program dollars - a program funded by the American public for the benefit of the American public.

97.   No facts exist to support defendants' estoppel affirmative defense.

98.   Defendants did not act in good faith in submitting CPMS/Bayview Hospital's 1997, 1998, and 1999 cost reports.

99.   Defendants did not fully disclose material facts that were known to them in their transmittal letters that accompanied CPMS/Bayview Hospital's 1997, 1998, and 1999 cost reports. Instead, any disclosures were calculated to mislead the fiscal intermediary and gloss over false or recklessly made claims contained in the cost reports.

100.  Defendants could have, but did not, incorporate any of the nonallowable items in the cost reports for the purposes of establishing issues for appeal by following the Medicare Provider Reimbursement Manual procedure for "Cost Reports Filed Under Protest."

1

2  **II.  CONCLUSIONS OF LAW**

3  **A.     Jurisdiction and Venue**

4        This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, 31

5  U.S.C. § 3732(a), and its general equity jurisdiction.  This Court has personal jurisdiction over the

6  defendants because they submitted claims for payment to the United States from this district and

7  received payments from the United States in this district.  Venue is proper in this district under 28

8  U.S.C. § 1391 and 31 U.S.C. § 3732(a) because defendants conducted business in this district, and a

9  substantial part of the events giving rise to the causes of action in this case occurred in this district.

10  **B.     The Medicare Program**

11        During the relevant time period, Medicare reimbursed psychiatric hospitals based on the

12  actual costs incurred for the treatment of Medicare patients.  To qualify for reimbursement, the cost

13  must be: (1) for a Medicare-covered service, (2) related to patient care at the hospital, and (3)

14  reasonable. 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9.  A "reasonable cost" is the cost actually

15  incurred by the provider for the service and excludes any part of the cost that is unnecessary in the

16  efficient delivery of needed health services.  42 U.S.C. § 1395x(v)(1)(A).

17        The Medicare statute and regulations define a provider of service as a specific type of health

18  care facility including "a hospital."  42 U.S.C. § 1395x(u);  42 C.F.R. § 400.202.  Each hospital

19  participates in the Medicare program by entering into an individual provider agreement with the

20  Secretary of the Department of Health and Human Services (HHS).  42 U.S.C. § 1395cc.  The

21  statute further states that the "Secretary (of HHS) shall periodically determine the amount which

22  should be paid under this part to each provider of services with respect to the services furnished by **it**

23  ...."  42 U.S.C. § 1395g(a) (emphasis added).  The regulations provide that "payment is to be made

24  on the basis of current costs of the individual provider . . . ."  42 C.F. R. § 413.5(a) (emphasis

25  added).  In addition, the regulations provide that "reimbursement under the Medicare program

26  involves a determination of – (1) Each provider's allowable costs for producing services . . . ."  42

27  C.F.R. § 413.50(a)(1) (emphasis added).  Medicare pays only for the costs of caring for Medicare

28  beneficiaries:  "the necessary costs of efficiently delivering covered services to individuals covered

by the insurance programs established by this subchapter will not be borne by individuals not so

covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . ." Id. One of the reasons that Medicare reimburses a hospital only for its own costs is to implement this statutory proscription. See 42 C.F.R. § 413.50(b).

To determine reimbursement amounts, Medicare apportions the provider's allowable indirect costs between Medicare patients and non-Medicare patients and then pays the share of the costs that relate to the Medicare patients. 42 C.F.R. § 413.50. As authorized by 42 U.S.C. § 1395h, HHS-CMS contracts with private insurance companies, referred to as "fiscal intermediaries," to pay providers of Part A services. The fiscal intermediaries pay providers using monies allocated by the United States from the Federal Hospital Insurance Trust Fund. *See* 42 U.S.C. § 1395i & 1395g.

Once a provider is authorized by Medicare to render Part A services, the fiscal intermediary will pay the provider an interim amount periodically throughout the year that is based on estimated treatment costs for the provider's Medicare patients. *See* 42 U.S.C. § 1395g(e). At the end of the year, the provider submits a final accounting of its costs for the year to the fiscal intermediary in a document called a "cost report." 42 C.F.R. § 413.20(b). The regulations further provide that fiscal intermediaries "will establish a basis for interim payments to each provider" based upon estimates. 42 C.F.R. § 413.60(a) (emphasis added). Further, "[a]t the end of the period, the actual apportionment, based upon the cost finding and apportionment methods selected by the provider, determines the Medicare reimbursement for the actual services provided to beneficiaries during the period." 42 C.F.R. § 413.60(b) (emphasis added).[4/] The fiscal intermediary uses the cost report to determine the total reimbursement actually due the provider for Medicare services that year. Federal regulations require Part A providers to furnish the fiscal intermediary with accurate and sufficient data to ensure proper payment. 42 C.F.R. § 413.20(a); 413.20(d); 413.24(a).

The cost report is signed by the provider's administrator or chief financial officer. The signing official must also certify that the report is "true, correct, complete and prepared from the

---

[4/]   "Medicare provides that providers of services will be paid amounts that are determined to be due to them, but not sooner than on a monthly basis, with necessary adjustments caused by previously made overpayments or underpayments. Interim payments are made on the basis of estimated costs submitted by the hospital to Medicare. Actual costs reimbursable to a provider cannot be determined until the cost reports are filed and costs are verified. Therefore, a retroactive adjustment will be made at the end of the reporting period to bring the interim payments made to the provider during the period into agreement with the reimbursable amount payable to the provider for the services furnished to program beneficiaries during that period." 42 C.F.R. § 413.64(f).

1   books and records of the provider in accordance with applicable instructions, except as noted"  42

2   C.F.R. § 413.24(f)(4)(iv).

3          The signing official further certifies familiarity with the laws and regulations regarding the

4   provision of health care services and attests that the services identified in the cost report were

5   provided in compliance with those laws and regulations.  Id.

6          Hospitals are required to remit a full refund of overpayments to Medicare at the time they file

7   their cost reports.  PRM § 2409.1(2).  Other legal obligations of participating providers are:

8          a.     not to make false statements or misrepresentations of material facts concerning

9                 payment requests, 42 U.S.C. §§ 1320a-7b(a)(1)&(2); 42 U.S.C. § 1320a-7a(1); 42

10                 C.F.R. § 413.24(f)(4)(iv); 42 C.F.R. § 1001.101(a)(1); and

11         b.     to know the information contained in HHS-CMS and fiscal intermediary notices,

12                including manual issuances, bulletins, and other written guides and directives,  42

13                C.F.R. § 411.406.

14         An organization related to a provider by common ownership or control is a "related party" to

15   the provider.  42 C.F.R. §§ 413.17(a); 413.17(b).  Costs applicable to services furnished to a

16   provider by a related party are allowable only at the cost to the related party.  42 C.F.R. § 413.17(a).

17   Management contracts with related parties must be specifically identified in the cost report so the

18   fiscal intermediary can determine whether the management costs reflect the costs to the related

19   party, whether the costs are within the price of comparable services that may be purchased

20   elsewhere, and whether the provider acted as a prudent buyer.  42 C.F.R. § 413.17(a); *CMS Provider*

21   *Reimbursement Manual 1* § 2135.3(A).

22   **C.     The False Claims Act**

23         The FCA states that "[a]ny person" who "knowingly presents, or causes to be presented, to

24   an officer or employee of the United States Government * * * a false or fraudulent claim for

25   payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record

26   or statement to get a false or fraudulent claim paid or approved by the government . . ." is liable to

27   the government for civil penalties and treble damages.  31 U.S.C. 3729(a)(1), (a)(2).  In 1986,

28   Congress added section 3729(a)(7) – the so-called "reverse" false claim provision – which imposes

     liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or

1  statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the

2  Government."  The FCA imposes liability when: (1) a person presents, or causes the presentation of,

3  a claim for payment or approval, or to decrease an obligation owed to, the Government; (2) the claim

4  is false or fraudulent; and (3) the person acted knowingly.  31 U.S.C. § 3729(a) (1), (a)(2), (a)(7);

5  see, also, United States ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc., 400 F.3d

6  428, 450-51 (6th Cir. 2005).

7        i.  **Defendants Caused Presentment of the Claims**

8        Regarding liability for causing the submission of a false claim, the FCA "was intended to

9  reach all types of fraud, without qualification, that might result in a financial loss to the

10  Government."  Neifert-White Co., 390 U.S. at 232 (1968).  The FCA "reaches beyond 'claims' which

11  might be legally enforced to all fraudulent attempts to cause the Government to pay out sums of

12  money."  Id, at 233.  "The FCA 'reaches any person who knowingly *assisted* in causing the

13  government to pay claims which were grounded in fraud without regard to whether that person had

14  direct contractual relations with the government."  United States v. Mackby,  261 F.3d 821, 827 (9th

15  Cir. 2001)(quoting United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943)) (emphasis in

16  Mackby).  "Thus, a person need not be the one who actually submitted the claim forms in order to be

17  liable." Mackby. 261 F.3d at 827 (citing United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir.

18  1997)).  "'[T]he [FCA] is violated not only by a person who makes a false statement or a false

19  record, . . . but also by one who engages in a fraudulent course of conduct that causes the

20  government' to lose money by honoring a false claim." United States v Raymond & Whitecomb Co.,

21  53 F. Supp. 2d 436, 445 (S.D.N.Y. 1999) (citation omitted).

22        Bourseau and Dr. Sabaratnam caused the presentment of the claims.  Bourseau served as

23  Chairman of CPMS/Bayview Hospital's Board of Directors, President of RIB (the managing partner

24  of CPMS), directed the inclusion of the costs on CPMS/Bayview Hospital's cost reports, and signed

25  the cost reports certifying that they were true, correct, and complete statements prepared from

26  CPMS/Bayview Hospital's books and records in accordance with applicable instructions.  Dr.

27  Sabaratnam was the CEO of CPMS/Bayview Hospital, President of Navatkuda (a general partner of

28  CPMS), and agreed with Bourseau's direction to include the costs in CPMS/Bayview Hospital's cost

reports.

ii.    **The Claims Were False**

     a.    **Interest**

The $2,550,722 interest claim on CPMS/Bayview Hospital's 1997 cost report was nonallowable and a false claim because none of it was paid in 1997 or within one year, and in fact, the claimed accrued interest amount was never paid by CPMS, 42 C.F.R. § 413.100(c)(2)(i)(A); the amount claimed substantially inflated the amount of interest incurred which was related to Medicare patient care at CPMS/Bayview Hospital, 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9(a); it was not supported by adequate documentation, 42 C.F.R. 413.20(a); 413.20(d); 413.24(a); and it was not contained in CPMS/Bayview Hospital's financial records in 1997. PRM § 202.

The $2,761,803 interest claim on CPMS/Bayview Hospital's 1998 cost report was nonallowable and a false claim because none of it was paid in 1998 or within one year, and in fact, the claimed accrued interest amount was never paid by CPMS, 42 C.F.R. § 413.100(c)(2)(i)(A); the amount claimed substantially inflated the amount of interest incurred which was related to Medicare patient care at CPMS/Bayview Hospital, 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9(a); it was not supported by adequate documentation, 42 C.F.R. 413.20(a); 413.20(d); 413.24(a); it was not contained in CPMS/Bayview Hospital's financial records in 1998, PRM § 202; and it was owed to a related party beginning in April 1998. 42 C.F.R. § 153(b)(3)(ii).

The $336,899 program cost on CPMS/Bayview Hospital's 1999 cost report was nonallowable and a false claim because it was really for accrued interest which was not paid in 1999 or within one year, and in fact, was never paid by CPMS, 42 C.F.R. § 413.100(c)(2)(i)(A); and it was not supported by adequate documentation, 42 C.F.R. 413.20(a); 413.20(d); 413.24(a).

     b.    **Bankruptcy Fees**

The bankruptcy fees claimed on CPMS/Bayview Hospital's 1997, 1998, and 1999 cost reports to the extent they related to CPMS disputes arising out of non-Bayview hospital operations were nonallowable and a false claim made with reckless disregard for the truth because they substantially inflated the amount of fees incurred which were directly related to patient care at CPMS/Bayview Hospital, 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9(a); PRM § 2183; the documentation does not show that they were paid within one year, 42 C.F.R. § 413.100(c)(2)(i)(A); and they were not supported by adequate documentation. 42 C.F.R. 413.20(a); 413.20(d); 413.24(a).

c.   **Management Fees**

The management fees claims on CPMS/Bayview Hospital's 1998 and 1999 cost reports were nonallowable and a false claim to the extent that fees paid to NCFE were claimed because NCFE provided no management services at all to CPMS/Bayview Hospital.  42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9 (a).  Additionally, the fees paid to NCFE were paid to a related party but not reduced to cost, 42 C.F.R. § 413.17(a); they were not supported by adequate documentation, 42 C.F.R. 413.20(a); 413.20(d); 413.24(a); PRM § 2135.2 B; 2135.5; they exceeded the price of comparable services that could be purchased elsewhere, 42 C.F.R. § 413.17(a); they exceeded what a prudent and cost conscious buyer would pay, PRM § 2103; they were not related to patient care at CPMS/Bayview Hospital, 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9(a); and the services ostensibly supplied duplicated services provided in-house.  PRM § 2135.4(B).

d.   **Fictitious Rent**

The rent expense of $396,209 on CPMS/Bayview Hospital's 1998 cost report was nonallowable and a false claim because the claimed expense was fictitious, 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9 (a).

e.   **Space**

The 16,965 square feet increase in square footage for a PHP program on CPMS/Bayview Hospital's 1998 and 1999 cost reports was nonallowable and a false claim made with reckless disregard for the truth because it substantially inflated the amount of actual space used for patient care, 42 C.F.R. § 413.9(a); and it was not supported by adequate documentation, 42 C.F.R. 413.20(a); 413.20(d); 413.24(a).  As between the Government and Defendants, Defendants were in the best position to bring forth evidence that additional space was actually used for delivering services to medicare patients.  Defendants failed to present convincing evidence that the additional space was actually used or necessary as back-up space for the provision of care to Medicare patients.

iv.   **Defendants Acted Knowingly**

The FCA requires that a defendant know the claim is false or fraudulent.  "Knowledge" includes actual knowledge, or acting in deliberate ignorance or with reckless disregard for the truth or falsity of the information.  31 U.S.C. § 3729(b); <u>United States ex rel. Oliver v. Parsons</u>, 195 F.3d 457, 464 (9th Cir. 1999).  No specific intent to defraud the United States is required, 31 U.S.C. §

1   3729(b), and reckless disregard has been construed to be an extreme version of ordinary negligence.

2   The focus of the knowledge element under the FCA is the defendant's knowledge of the falsity of its

3   claims.  Moreover, a provider that fails to inform itself of the reimbursement requirements acts in

4   reckless disregard of the truth of its claims.

5         Bourseau and Dr. Sabaratnam acted with knowledge of the falsity of the fictitious lease

6   claim, knowledge of the falsity of the accrued interest claims as none of the claimed interest was

7   ever paid by CPMS, and with reckless disregard for the truth or falsity of the other false claims, in

8   causing the submission to Medicare of the false costs on CPMS/Bayview Hospital's 1997, 1998, and

9   1999 cost reports.  The false costs claimed were not the product of errors based upon merely flawed

10  reasoning and differences in interpretation of disputed legal questions.  Neither Bourseau nor Dr.

11  Sabaratnam studied or consulted the Medicare reimbursement statutes, regulations, or PRM, nor did

12  they seek the advice of attorneys in arriving at their decisions to include the nonallowable and false

13  claims in the 1997, 1998, and 1999 cost reports.

14        v.    **Defendants Conspired to Defraud Medicare**

15        Bourseau and Dr. Sabaratnam agreed with each other to cause the submission by CPMS of

16  the false claims as costs contained in CPMS/Bayview Hospital's 1997, 1998, and 1999 cost reports.

17        vi.    **Defendants Are Jointly and Severally Liable**

18        Where one or more persons have acted together to submit false claims to the government in

19  violation of the FCA, each is joint and severally liable for the treble damages and statutory penalty.

20  Bourseau, Dr. Sabaratnam, RIB Medical Management Services, Inc. and Navatkuda, Inc. are each

21  jointly and severally liable for the full recovery in this case.  United States of America v. Century

22  Health Services, 136 F.Supp.2d 876, 895 (M.D. Tenn. 2000) (corporate officers are liable in their

23  individual capacities under the False Claims Act if they knowingly or with reckless disregard make

24  false claims for payment on behalf of the corporation).

25        vii.    **Damages and Penalties**

26        The damages in this case are $7,925,444.  The United States is entitled to recover three times

27  its single damages.  The United States is entitled to recover treble damages in the amount of

28  $23,776,332.  The United States is entitled to judgment against Bourseau, Dr. Sabaratnam, RIB

1   Medical Management Services, Inc. and Navatkuda, Inc., jointly and severally, in the amount of

2   $23,776,332 for treble damages and penalties under the FCA.

3        Additionally, civil penalties of $10,000 (for the 1997 cost report), $10,000 (for the 1998 cost

4   report), and $11,000 (for the 1999 cost report),  for a total of $31,000 in civil penalties are imposed

5   against Bourseau, Dr. Sabaratnam, RIB Medical Management Services, Inc. and Navatkuda, Inc.,

6   jointly and severally, pursuant to 31 U.S.C. § 3729(a).

7   **D.**    **Unjust Enrichment**

8        The United States may recover for unjust enrichment against a person who has received

9   benefits, the retention of which by that person would be unjust.  See, e.g., United States v. Applied

10  Pharmacy, 182 F.3d 603 (8th Cir. 1999); Matarese v. Moore-McCormack Lines, Inc., 158 F.2d 631

11  (2d Cir. 1946); Blusal Meats, Inc. v. United States, 638 F. Supp. 824 (S.D.N.Y. 1986), aff'd, 817

12  F.2d 1007 (2d Cir. 1987).

13       The Government did not prove by a preponderance of the evidence that Defendants Robert

14  Bourseau or Dr. Sabaratnam were unjustly enriched by the Medicare overpayments to

15  CPMS/Bayview Hospital, although CPMS monies were transferred back and forth between CPMS

16  and their other business ventures in Villa View Hospital (also a CPMS entity),  Hellman LLC,

17  Intercare Resources, Ingleside Hospital, the City of Angels Hospital, N.P.S.I., and 1711 Temple

18  LLC.  Consequently, the Defendants are entitled to judgment against the Government on its claim of

19  unjust enrichment.

20  **E.**    **Common Law Fraud**

21       The Government did not prove by a preponderance of the evidence that any of the

22  Defendants made false representations with the necessary intent to defraud or that the Government

23  relied on the false representations.  Therefore, the Government may not recover against any of the

24  Defendants upon its claim for common law fraud.

25  **F.**    **Defendants' Affirmative Defenses**

26       This case is ripe for adjudication. The statute of limitations for both the FCA and unjust

27  enrichment claims is six years.  31 U.S.C. § 3731(b)(1); 28 U.S.C. § 2415(a).  CPMS/Bayview

28  Hospital's 1997 cost report was submitted in June 1998.  The complaint was filed in May 2003, less

than six years later.  Consequently, the United States FCA and unjust enrichment claims are not time

barred.  The United States' common law fraud claim is governed by a three-year statute of limitations, 28 U.S.C. § 2415(b), which is tolled for all periods during which "facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances."  28 U.S.C. § 2416(c).  Accordingly, defendants' affirmative defense of statute of limitations is rejected.

Waiver is the voluntary, intentional relinquishment of a known right.  *See, e.g., Trane Co. V. Whitehurst-Lassen Const. Co.*, 881 F.2d 996, 1003 (11th Cir. 1989); *Apponi v. Sunshine Biscuits*, 809 F.2d 1210, 1217 (6th Cir. 1987).  There has been no such conscious decision by any authorized agent of the United States permanently to abandon a right to recovery against defendants.  *See Utah Power & Light Co. v. U.S.*, 243 U.S. 389, 408-409 (1917); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Heckler v. Community Health Serv. of Crawford County, Inc.*, 467 U.S. 51 (1984).  Accordingly, defendants' affirmative defense of waiver against the United States is rejected.

The equitable defense of laches may not be asserted against the United States.

The United States is not estopped from recovering for its claims in this case

Defendants did not act in good faith in causing the submission of false claims on CPMS/Bayview Hospital's 1997-1999 cost reports.  Defendants' affirmative defense of good faith is rejected.

### III.  CONCLUSION

The United States is entitled to judgment against Robert I. Bourseau, Dr. Rudra Sabaratnam, RIB Medical Management Services, Inc., and Navatkuda, Inc., jointly and severally, in the amount of $23,776,332 for treble damages and $31,000 in civil penalties under the False Claims Act.  Defendants are entitled to a judgment of non-liability against the United States on its claims of unjust enrichment and common law fraud.

IT IS SO ORDERED.

DATED:  September 29, 2006

_____
Hon. Roger T. Benitez
United States District Judge

-22-                                                                              03cv907

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

03cv907