1  PETER D. KEISLER
   Assistant Attorney General
2  CAROL C. LAM
   United States Attorney
3  ROBERT CIAFFA
   Assistant U.S. Attorney
4  California Bar Number 179432
   Office of the United States Attorney
5  880 Front Street, Room 6293
   San Diego, California 92101-8893
6  Telephone: (619) 557-7455

7  MICHAEL F. HERTZ
   DANIEL R. ANDERSON
8  ROBERT J. MCAULIFFE
   GEJAA T. GOBENA
9  U.S. Department of Justice
   P.O. Box 261
10 Ben Franklin Station
   Washington, D.C. 20044
11 Telephone: (202) 514-6832
   Facsimile: (202) 616-3085
12
   Attorneys for the
13 United States of America

**NUNC PRO TUNC**

**MAY 1 2 2006**

14

15                 UNITED STATES DISTRICT COURT

16                 SOUTHERN DISTRICT OF CALIFORNIA

17 UNITED STATES OF AMERICA,          )   No.  03-CV-00907-BEN (WMC)
                                      )
18              Plaintiff,            )
                                      )
19         v.                         )
                                      )
20                                    )   PRETRIAL CONF.: May 15, 2006
                                      )   TIME:           3:00 p.m.
21 ROBERT I. BOURSEAU, et al.,        )   CTRM:           3, 4th Floor
                                      )   Hon. Roger T. Benitez
22              Defendants.           )
                                      )
23 _____)

24

25                  PROPOSED PRETRIAL ORDER

26 Following pretrial proceedings pursuant to Fed.R. Civ. P. 16 and Civil Local Rule 16.1.f.6;

27      IT IS ORDERED

28

I.

## NATURE OF ACTION

This is a civil action brought by the United States of America under the False Claims Act (31 U.S.C. § 3729, *et seq.*) in connection with allegedly false or fraudulent Medicare cost reports submitted by Bayview Hospital & Mental Health Systems ("Bayview") for 1997, 1998 and 1999. Plaintiff also asserts alternative causes of action for unjust enrichment and common law fraud. The defendants are Robert I. Bourseau, Rudra Sabaratnam, RIB Medical Management Services, Inc. and Navatkuda, Inc. The pleadings raising the relevant issues are Plaintiff's complaint and Defendants' answer.

II.

## JURISDICTION AND VENUE

Federal jurisdiction is invoked pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345. Venue is proper in the Southern District of California pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

III.

## STIPULATED FACTS

The following facts are admitted and require no proof:

A.     Entities

    1.     Bayview Hospital & Mental Health Systems (Bayview), a psychiatric hospital in Chula Vista, California, was owned and operated by California Psychiatric Management Services (CPMS).

    2.     CPMS was a California Limited Partnership.

    3.     Robert I. Bourseau (Bourseau) served as Chairman of Bayview's Board of Directors and President of RIB Medical Management Services, Inc., (RIB) the Managing General Partner of CPMS.

    4.     Bourseau signed Bayview's 1997-1999 cost reports certifying that the reports were true, correct, and complete statements prepared from Bayview's books and records in accordance with applicable instructions and that he was

-2-

familiar with the laws and regulations regarding the provision of health care services, and that the services identified in the cost reports were provided in accordance with those laws and regulations.

5.  Rudra Sabaratnam (Sabaratnam), a licensed physician, was the Chief Executive Officer of Bayview, a member of Bayview's Board of Directors, and President of Navatkuda, Inc., (hereinafter "Navatkuda") a general partner of CPMS.

6.  RIB and Navatkuda were the only general partners of CPMS.

7.  Bourseau controlled RIB.

8.  Sabaratnam controlled Navatkuda.

B.  The Medicare Program

9.  The United States administers the hospital insurance benefits program for the aged and disabled, commonly referred to as "Medicare Part A." 42 U.S.C. §§ 1395c – 1395i-5. The Medicare program was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. §§ 1395–1395ggg).

10.  The agency of the United States responsible for the Medicare program is the United States Department of Health and Human Services (HHS). *See, e.g.,* 42 U.S.C. §§ 1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r, 1395u. The agency within HHS administering the program is the Centers for Medicare & Medicaid Services (HHS-CMS), which prior to July 1, 2001, was known as the Health Care Financing Administration (HCFA). Notice, 66 Fed. Reg. 35437 (2001).

11.  Medicare Part A provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care. 42 U.S.C. § 1395c. Benefits include services provided by psychiatric hospitals. 42 U.S.C. § 1395d(c).

12.  When electing to participate in the Medicare program, the provider enters into a contract with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare

-3-

1    reimbursement, including the provisions of Section 1866 of the Social Security

2    Act and Title 42 of the Code of Federal Regulations.

3    C.    Before CPMS' 1996 Bankruptcy

4    13.    In November 1991, CPMS became a limited partnership.

5    14.    Between November 1991 and 1995, CPMS entered into contracts to manage

6    the Psychiatric Units in five hospitals in the Los Angeles, California area:  South

7    Bay Hospital, Mission Hospital (San Fernando Hospital and Panorama

8    Hospital), L.A. Metro Hospital, and Bellflower Hospital (the five Los Angeles

9    Hospitals).

10   15.    Pursuant to the management contracts with the five Los Angeles hospitals,

11   CPMS agreed to provide management services to these hospitals' Psychiatric

12   Units.

13   16.    Each Los Angeles hospital had ultimate control over its own Psychiatric Unit.

14   17.    Each Los Angeles hospital submitted its own cost report to Medicare that

15   included expenses for its Psychiatric Unit.

16   18.    Each of the Psychiatric Units was housed in the respective Los Angeles

17   hospitals.

18   19.    Beginning in June 1993, CPMS commenced a series of financing arrangements

19   with National Century Financial Enterprises, Inc. and its subsidiaries and

20   affiliates, including but not limited to National Premier Financial Services, Inc.

21   and its affiliates (collectively NCFE), in connection with CPMS' management of

22   the Psychiatric Units in the Los Angeles hospitals.

23   20.    CPMS acquired Bayview in or around August 1994.

24   21.    In or around September 1994, HHS-CMS accepted Bayview's request to

25   participate as a psychiatric hospital in the Medicare program.   Bayview's

26   Provider Agreement was signed in August and September 1994.   In its

27   agreement with HHS-CMS, Bayview agreed to conform to the provisions of

28   Section 1866 of the Social Security Act and Title 42 of the Code of Federal

-4-

Regulations. Bayview's Provider Agreement was terminated effective November 29, 2000.

22. Beginning in November 1994, NCFE provided financing to CPMS in connection with CPMS' operation of Bayview.

23. Beginning in 1994, CPMS was engaged in litigation with the five Los Angeles Hospitals, and by 1995 all of the management agreements were terminated by those hospitals.

D. CPMS' 1996 Bankruptcy

24. On or about April 9, 1996, CPMS, voluntarily filed a petition in the United States Bankruptcy Court for the Central District of California under Chapter 11 of the Bankruptcy Code (Reorganization) (the 1996 Bankruptcy).

25. At the time of the 1996 Bankruptcy, National Century Financial Enterprises, Inc. and its subsidiaries and affiliates, including but not limited to National Premier Financial Services, Inc. and its affiliates (collectively NCFE), claimed that CPMS was indebted to it in excess of $12 million.

26. After the Chapter 11 filing, the Bankruptcy Court appointed Alfred Siegal as an independent trustee to take over the operations of CPMS, including oversight of Bayview.

27. From April 1996 up until approximately early April 1998, Bayview's financial operations were managed by the court-appointed trustee.

28. In or around March 1998, the bankruptcy court approved a reorganization plan for CPMS which, among other things, gave NCFE a 49.9 % limited partnership interest in CPMS.

29. As a result of NCFE acquiring a 49.9% limited partnership interest in CPMS in March 1998, CPMS and NCFE became related parties.

E. Pacific Hospital Management and Mutual of Omaha

30. Before 1997, Bayview retained Pacific Hospital Management (PHM), Oakland, California, to prepare and transmit on Bayview's behalf Bayview's cost reports.

1    The PHM consultants handling the Bayview account were Paul Fayollat and
2    Loretta Masi.

3    31.    Fayollat provided cost report preparation services to defendants since 1986.

4    32.    PHM prepared and transmitted on Bayview's behalf Bayview's 1997-1999
5    Medicare cost reports.

6    33.    Mutual of Omaha Insurance Company (Mutual of Omaha) was the fiscal
7    intermediary (FI) responsible for paying Bayview for its Medicare services.

8    F.    Bayview's 1997 Cost Report

9    34.    Fayollat, who has provided cost report preparation services to clients since
10   1976, has an MBA, and is a CPA.

11   35.    Fayollat's firm prepared a preliminary Bayview 1997 cost report in May 1998.

12   36.    A meeting then took place around May 18, 1998, attended by Bourseau, Seth
13   Morriss (CPMS' Director of Finance), Masi, and Fayollat.

14   37.    Bayview's 1997-1998 cost reports included the full amount of interest charged
15   to CPMS by NCFE, and Bayview's 1997 cost report included the full amount
16   of CPMS' bankruptcy legal fees.

17   G.    Bayview's 1998 Cost Report

18   38.    Fayollat's firm prepared a preliminary Bayview 1998 cost report in May 1999.

19   39.    A meeting then took place around May 12, 1999, attended by Bourseau,
20   Morriss, Masi, and Fayollat.

21   i.    Square Footage

22   40.    Also during the May 12, 1999 meeting, Bourseau directed Fayollat to increase
23   the square footage reported in Bayview's 1998 cost report by approximately
24   16,900 square feet for the partial hospitalization program.

25   41.    Bayview's 1998 cost report included 16,965 additional square feet for the
26   partial hospitalization program.

27   ii.    Management Fees

28   42.    Bayview's 1998 cost report included $600,000 in management fees.

H.    Bayview's 1999 Cost Report

        i.     Management Fees

43.    Bayview's 1999 cost report included $630,000 in management fees.

I.    CPMS' Second Bankruptcy

44.    On June 9, 2000, CPMS filed for bankruptcy for the second time.

45.    The government filed a claim in the second bankruptcy for approximately $14 million.

46.    To date, the government has recovered nothing on its claim in CPMS' second bankruptcy, which is still pending.

J.    The Complaint

47.    The Complaint in this case was filed on May 6, 2003.

K.    Admissions

48.    Beginning in June 1993, NCFE provided financing to CPMS in connection with CPMS's receivables generated at Mission Hospital and L.A. Metro.

49.    Beginning in August 1993, NCFE provided financing to CPMS in connection with CPMS's receivables generated at Bellflower Hospital.

50.    Beginning in approximately July 1994, NCFE provided financing to CPMS in connection with CPMS's receivables generated at South Bay Hospital.

51.    On or about December 12, 1997, CPMS filed its Fifth Amended Disclosure Statement in the 1996 Bankruptcy (the Chapter 11 Disclosure).

52.    On or about December 12, 1997, CPMS filed its Fifth Amended Chapter 11 Plan in the 1996 Bankruptcy (the Chapter 11 Plan).

53.    On or about March 9, 1998, the Bankruptcy Court entered an order approving the Chapter 11 Plan.

54.    On or about December 15, 1997, NCFE made the NPF Election as described in the Chapter 11 Plan and the Chapter 11 Disclosure.

55.    Bourseau and Sabartnam signed an Amended and Restated Limited Partnership Agreement California Psychiatric Management Services dated for reference purposes as of the 17th day of February, 1998.

56.   The 1997 Medicare cost report filed by Bayview included $2,550,722 in interest charged to CPMS by NCFE.

57.   The 1997 Medicare cost report filed by Bayview included $1,303,383 in bankruptcy professional fees.

58.   The 1998 Medicare cost report filed by Bayview included $2,761,803 in interest charged to CPMS by NCFE.

59.   The 1998 Medicare cost report filed by Bayview included $180,000 in bankruptcy professional fees.

60.   The 1999 Medicare cost report filed by Bayview reported, as a protested item, $3,000,000 in interest charged to CPMS by NCFE.

61.   The 1999 Medicare cost report filed by Bayview included $94,666 in bankruptcy professional fees.

62.   The 1999 Medicare cost report filed by Bayview included 16,965 additional square feet for the partial hospitalization program.

L.   Other

63.   Accompanying Bayview's 1999 cost report was a July 27, 2000 transmittal letter in which Mutual was advised as follows:

"Within this report are Protested Items entered on Worksheet E, B and on E-3, III.  The impact of these protested items has been calculated to be $1,855,000. These items represent amounts for Interest Expense and Community Relations costs previously disallowed by auditors and which Bayview Hospital disagrees. A workpaper for these amounts is included."

64.   Mutual has never provided Bayview with a final audit or final settlement respecting any of the cost reports at issue in this case nor has it ever issued a Notice of Program Reimbursement stating the amount allegedly owed to the Medicare program in reimbursement for the 1997, 1998 or 1999 calendar years.

65.   In addition to other points, Mr. Clingo's memorandum to Mutual highlighted particular items in Bayview's 1997 and 1998 cost reports to investigate and suggested specific areas of inquiry to pursue.

66. The cost reports were submitted by Bayview to Mutual of Omaha at the earliest on May 29, 1998.

67. Mutual of Omaha did not grant Bayview an extension for liquidating the $2,550,722 in interest charged to CPMS by NCFE in 1997.

68. Mutual of Omaha did not grant Bayview an extension for liquidating the $2,761,803 in interest charged to CPMS by NCFE in 1998.

IV.

RESERVATIONS AS TO FACTS

The reservations as to the facts recited in paragraph III above are as follows:

A.   Plaintiff's Reservations

    1.   Plaintiff objects to the admissibility of the following facts from Section III of this Order on the grounds indicated:

        (1)   Fact Nos. 45-46 [FRE 402]; and

        (2)   Fact Nos. 63-64 [FRE 402, 403].

B.   Defendants' Reservations

    1.   Defendants object to the admissibility of the following facts from Section III of this Order on the grounds indicated:

        (1)   Fact No. 27 [FRE 402]; and

        (2)   Fact Nos. 67-68 [FRE 402].

V.

FACTS NOT TO BE CONTESTED BY EVIDENCE TO THE CONTRARY

The following facts, though not admitted, are not to be contested at the trial by evidence to the contrary:

1. Plaintiff is the United States and brings this suit on behalf of the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services (hereinafter "HHS-CMS"), which administers the Medicare Program.

2. Each Los Angeles hospital had its own Medicare provider number.

-9-

3.  CPMS filed Home Office Cost Statements for 1994-1996, and identified as separate chain components of CPMS the following entities - Bayview, LA Metro, San Fernando, South Bay, Bellflower, and Panorama.

4.  Two of the topics discussed at the May 18, 1998 meeting, and in subsequent conversations in May 1998, were how much of the 1) interest ostensibly charged CPMS by NCFE, and 2) bankruptcy fees incurred by CPMS, should be included in Bayview's cost report.

5.  The management fees included in Bayview's 1998 cost report reflected payment of $20,000 per month to each of RIB, Navatkuda, and an NCFE entity.

6.  The management fees included in Bayview's 1999 cost report reflected payment of $20,000 per month to each of RIB, Navatkuda, and an NCFE entity.

7.  On July 7, 1999, David Clingo, Bayview's Vice President of Finance, wrote a letter to Mutual of Omaha stating that he believed "that there is a clear intent to commit fraud by some of the owners of" CPMS.

VI.

FACTS REMAINING TO BE LITIGATED

The following issues of fact, and no others, remain to be litigated upon the trial:

A.  Plaintiff's Contentions of Fact

   i.   The Medicare Program

   1.  Although all cost reports are subject to audit, it is widely known throughout the health care industry that the fiscal intermediaries have sufficient resources to audit only a very small number of the cost reports filed each year. Providers also are well aware that the process of finalizing cost report audits typically takes two-to-three years from filing. For these reasons, the Medicare cost reporting system relies substantially on the good faith of providers to prepare and file accurate cost reports.

   ii.  CPMS

-10-

2.      CPMS was not a Medicare provider and did not have its own Medicare provider number.

3.      CPMS did not submit cost reports to Medicare.

iii.     <u>Bayview's 1997 Cost Report</u>

4.      Bayview's preliminary 1997 cost report showed a payable to Medicare of more than $1 million; <u>i.e.</u>, Bayview owed Medicare more than $1 million.

5.      Sabaratnam attended the May 18, 1998 meeting with Bourseau, Morriss, Masi, and Fayollat.

6.      The purpose of the May 18, 1998 meeting was to discuss ways to reduce the payable owed to Medicare.

7.      Fayollat's professional judgment was that Medicare would disallow interest and bankruptcy legal fees unrelated to Bayview.

8.      Fayollat advised Bourseau and Sabaratnam that the amounts that could be included in Bayview's cost reports would be only the amounts related to the patient services at Bayview Hospital.

9.      Fayollat advised Bourseau and Sabaratnam in May 1998 that he believed that Medicare would not pay for expenses unrelated to Bayview that were included in Bayview's cost report, and consequently that it was not appropriate to include the full amount of the interest and bankruptcy legal fees in Bayview's cost report.

10.     Mr. Fayollat advised defendants that: 1) if it were up to him, he would not include interest and bankruptcy fees unrelated to Bayview in Bayview's cost reports; and 2) Medicare would not pay for such expenses.

11.     In a May 28, 1998 memorandum to Bourseau, Mr. Fayollat advised that including the full amount of the interest on the Bayview cost report would constitute a "trumped up" cost report.

-11-

12.   Bourseau and Sabaratnam ignored Mr. Fayollat's advice and decided to include interest and bankruptcy legal fees unrelated to Bayview in Bayview's cost report.

13.   Bourseau directed Mr. Fayollat to include the full amount of the interest ostensibly charged CPMS by NCFE ($2,550,722) and bankruptcy legal fees ($1.3 million) on Bayview's 1997 cost report.  [to be moved to Section III]

14.   Sabaratnam agreed with Bourseau's directive to Mr. Fayollat to include the full amount of the interest ostensibly charged CPMS by NCFE ($2,550,722) and bankruptcy legal fees ($1.3 million) on Bayview's 1997 cost report.

15.   No more than $405,000 of the $2,550,772 in interest claimed in Bayview's 1997 cost report related to a debt incurred for Bayview; the balance related to debt incurred for the Psychiatric Units in the five Los Angeles Hospitals CPMS managed between 1993 and 1995.

16.   No more than $443,239 of the $1.3 million in bankruptcy legal fees claimed in Bayview's 1997 cost report related to Bayview.

17.   Bayview had no intent to pay the 1997 interest ostensibly owed to NCFE.

18.   Bayview did not pay to NCFE the interest claimed on Bayview's 1997 cost report.

19.   Bayview did not provide Mutual of Omaha Insurance Company (Mutual of Omaha) with written justification for nonpayment of the $2,550,722 in interest charged to CPMS by NCFE in 1997.

20.   The 1997 interest was not specifically identified in Bayview's accounting records.

21.   Bayview did not provide sufficient documentation to support the interest claim.

22.   Bayview did not provide sufficient documentation to support the bankruptcy legal fees claim.

iv.   <u>Bayview's 1998 Cost Report</u>

23.   In September 1998, Fayollat determined that Bayview was being substantially overpaid by Medicare.

24.   Fayollat recommended to Bourseau various actions to limit the payable.

25. Bourseau did not follow Fayollat's recommendations.

26. Bayview's preliminary 1998 cost report showed a substantial payable to Medicare.

27. Sabaratnam attended the May 12, 1999 meeting with Bourseau, Morriss, Masi, and Fayollat.

28. The purpose of the meeting was to discuss ways to reduce the payable to Medicare.

   a.    Interest

29. Bourseau and Sabaratnam wanted the full amount of interest (approximately $2.7 million) ostensibly charged CPMS by NCFE included in Bayview's 1998 cost report.

30. Fayollat believed that Medicare would not pay for interest unrelated to Bayview and so advised Bourseau and Sabaratnam.

31. Bourseau and Sabaratnam did not follow Fayollat's advice.

32. Bourseau directed Fayollat to include the full amount of interest on Bayview's 1998 cost report.

33. Sabaratnam agreed with Bourseau's directive to Fayollat to include the full amount of interest on Bayview's 1998 cost report.

34. No more than $547,756 of the $2,761,803 in interest claimed related to a debt incurred for Bayview; the balance related to debt incurred for the Psychiatric Units in the five Los Angeles Hospitals CPMS managed between 1993 and 1995.

35. Fayollat also explained to Bourseau and Sabaratnam that in related party situations, such as the CPMS/NCFE related party situation, it was necessary to adjust the expenses claimed in the cost report of a related party to reflect only the actual cost to the related party.

36. No adjustments were made in Bayview's 1998 cost report to reflect only NCFE's actual costs.

37. Bayview had no intent to pay the 1998 interest ostensibly owed to NCFE.

-13-

38. Bayview did not pay to NCFE the interest claimed on Bayview's 1998 cost report.

39. Bayview did not provide Mutual of Omaha with written justification for nonpayment of the $2,761,803 in interest charged to CPMS by NCFE in 1998.

40. Until May 1999, the 1998 interest was not specifically identified in Bayview's accounting records.

41. Bayview did not provide sufficient documentation to support the interest claim.

    b.    <u>Bankruptcy Legal Fees</u>

42. As with the bankruptcy legal fees in Bayview's 1997 cost report, Fayollat advised Bourseau and Sabaratnam that only those fees related to Bayview should be included in Bayview's 1998 cost report. Bourseau and Sabaratnam did not follow Fayollat's advice. Bayview's 1998 cost report included the full amount of bankruptcy legal fees ($180,000).

43. Bayview did not provide sufficient documentation to support the bankruptcy legal fees claim.

    c.    <u>Lease</u>

44. Also during the May 12, 1999 meeting, Bourseau directed Fayollat to add to Bayview's 1998 cost report a rent expense of $396,209 for a lease in which another entity controlled by Bourseau and Sabaratnam, Intercare Resources, was the landlord and Bayview was the tenant.

45. Sabaratnam raised no concerns about including this rent expense in Bayview's 1998 cost report.

46. This rent expense was included in Bayview's 1998 cost report.

47. There was never a lease with Intercare Resources.

48. The rent expense was fictitious.

49. A few weeks after the May 12, 1999 meeting, Morriss told Bourseau that it was wrong to include the fictitious rent expense on Bayview's 1998 cost report.

    d.    <u>Square Footage</u>

-14-

50. The additional square footage included in Bayview's 1998 cost report was not used for patient care.

51. Bayview did not provide sufficient documentation to support the increase in square footage claim.

   e.   Management Fees

52. Before Bayview's 1998 cost report was finalized, Fayollat advised Bourseau and Sabaratnam that they would need documentation to support the management fees claimed, such as documents showing how much time they spent providing management services and what other hospitals were paying for similar management services.

53. Bayview did not provide sufficient documentation to support the $600,000 management fee claim.

54. The services provided by RIB, Navatkuda, and the NCFE entity were limited and cost more than the price of comparable services that could have been purchased elsewhere by a prudent buyer.

   v.   Bayview's 1999 Cost Report

   a.   Bankruptcy Legal Fees

55. As with the bankruptcy legal fees in Bayview's 1997 cost report, Fayollat advised Bourseau and Sabaratnam that only those fees related to Bayview should be included in Bayview's 1999 cost report. Bourseau and Sabaratnam did not follow Fayollat's advice. Bayview's 1999 cost report included the full amount of bankruptcy legal fees ($94,666).

56. Bayview did not provide sufficient documentation to support the bankruptcy legal fees claim.

   b.   Square Footage

57. Bayview's 1999 cost report included the same additional 16,965 square feet for the partial hospitalization program as was included in Bayview's 1998 cost report.

59. The additional square footage was not used for patient care.

1     60.   Bayview did not provide sufficient documentation to support the additional

2           square footage claim.

3           c.    Management Fees

4     61.   Bayview did not provide sufficient documentation to support the $630,000

5           management fee claim.

6     62.   The services provided by RIB, Navatkuda, and the NCFE entity were limited

7           and cost more than the price of comparable services that could have been

8           purchased elsewhere by a prudent buyer.

9           d.    Program Costs

10    63.   Bayview's 1999 cost report included $336,899 in program costs payable to an

11          NCFE entity.

12    64.   These program costs ostensibly were for interest payable to NCFE for

13          receivables NCFE was financing in 1999.

14    65.   Bayview did not provide sufficient documentation to support the program costs

15          claim.

16    vi.   Overpayments Not Refunded

17    66.   Bayview has not refunded to Medicare the overpayments it received from

18          Medicare during 1997 through 1999.

19    vii.  Disclosure of Potential Fraud

20    67.   In his July 7, 1999 letter to Mutual of Omaha, Clingo specifically referred to the

21          fictitious rent expense included in Bayview's 1998 cost report, the additional

22          square footage added to Bayview's 1998 cost report for space not used for

23          patient care, and to the interest claims in Bayview's 1997 and 1998 cost reports

24          which Bayview did not intend to, and did not in fact, pay.

25    viii. Damages and Penalties

26    68.   Damages were determined by adjusting out of the cost reports the non-

27          reimbursable costs submitted on the 1997 through 1999 cost reports.

28    69.   Damages are as follows:

Year    Non-Reimbursable Claim Eliminated                    Damage

-16-

| | 1997 | Interest | $1,494,753 |
|---|---|---|---|
| | | Bankruptcy Legal Fees | $636,208 |
| | 1998 | Interest | $1,807,880 |
| | | Bankruptcy Legal Fees | $112,303 |
| | | Management Fees | $569,541 |
| | | Rent for Partial Hospitalization Program | $414,618 |
| | | Increased Square Footage | $279,899 |
| | 1999 | Bankruptcy Legal Fees | $53,535 |
| | | Management Fees | $356,395 |
| | | Increased Square Footage | $135,521 |
| | | Program Costs | $190,571 |
| | Total | | $6,051,224 |

    ix.    <u>Contentions on Defendants' Affirmative Defenses</u>

70.    There has been no conscious decision by any authorized agent of the United States permanently to abandon a right of recovery against defendants.

71.    The United States seeks to recover money wrongfully paid from Medicare program dollars - a program funded by the American public for the benefit of the American public.

72.    No facts exist to support defendants' estoppel affirmative defense.

73.    Defendants did not act in good faith in submitting Bayview's 1997 through 1999 cost reports.

74.    Defendants did not disclose all material facts that were known to them in their transmittal letters that accompanied Bayview's 1997 through 1999 cost reports.

**B.**    <u>Defendants' Contentions of Fact</u>

1.    From approximately 1991 until 1995, California Psychiatric Management Services ("CPMS") leased space at varying points in time within the confines of Los Angeles Metro Hospital, Bellflower Hospital, South Bay Hospital and San Fernando Community Hospital in which psychiatric treatment was provided to Medicare patients (the "Psychiatric Units").

2.   The Psychiatric Units did not operate or own hospital facilities.

3.   Bayview Hospital & Mental Health Systems ("Bayview") and the Psychiatric Units are fictitious business names under which CPMS conducted business.

4.   CPMS, Bayview and the Psychiatric Units never existed as separate legal entities. Accordingly, only CPMS, in contrast to Bayview and the Psychiatric Units, filed tax returns or maintained a taxpayer identification number.

5.   Defendants did not participate in the preparation of, nor had control over, any Medicare cost report which may have been submitted by the hospitals in which the Psychiatric Units were located.

6.   Any Medicare cost reports submitted by the hospitals in which the Psychiatric Units were located could not have included any of the expense items identified in Bayview's 1997-1999 cost reports because information relating to the expenses of providing care to patients in the Psychiatric Units was never requested by, or provided to, these other hospitals.

7.   Plaintiff was aware no later than September 1995 that Bayview was a fictitious business name of CPMS.

8.   From approximately August 1994 until November 2000, CPMS conducted business under the name Bayview.

9.   During the three cost reporting years for Bayview at issue in this case, Mutual of Omaha Insurance Company ("Mutual") served as the fiscal intermediary and was responsible on Plaintiff's behalf for paying Bayview for services provided to Medicare patients.

10.  Given the multitude and complexity of the Medicare regulations governing cost reporting, and since neither Bourseau nor Sabaratnam possessed the necessary technical expertise to prepare the cost reports, Pacific Hospital Management ("PHM") was retained to (i) prepare Bayview's cost reports; and (ii) advise as to the types of expenses Medicare regulations permitted to be included in cost reports.

-18-

11. Defendants relied heavily upon PHM's expertise, specifically Paul Fayollat (PHM's President), to ensure that the subject cost reports complied with all applicable Medicare regulations.

12. Sabaratnam never directed Mr. Fayollat to include any expense in any of the Bayview cost reports at issue in this case. Indeed, Sabaratnam played no meaningful role in the preparation, evaluation, or filing of any of the subject cost reports.

13. In a May 28, 1998 facsimile to PHM, National Century Financial Enterprises, Inc. ("NCFE") confirmed CPMS had incurred $2,550,722 in interest expenses in connection with accounts receivable financing provided to CPMS ("the Financing Interest Expense").

14. On May 29, 1998, PHM submitted Bayview's 1997 cost report to Plaintiff through Mutual.

15. In a May 29, 1998 memorandum to Mr. Bourseau, Mr. Fayollat expressly confirmed his company's endorsement of Bayview's 1997 cost report as filed with Mutual.

16. Defendants relied on Mr. Fayollat's endorsement that the inclusion of the entire Financing Interest Expense in Bayview's 1997 cost report did not violate any applicable Medicare regulation.

17. In or about May, 1999, $1,500,000 of the Financing Interest Expense included in Bayview's 1997 cost report was paid through a wire transfer to one of the NCFE entities. In or about September, 1999, out of the proceeds of a $4,000,000 loan NCFE made to 1711 Temple, LLC, NCFE withheld $1,750,000 in further payment of the interest and principal.

18. Defendants relied on Mr. Fayollat's endorsement that inclusion of the full amount of bankruptcy legal fees CPMS incurred ("the Bankruptcy Legal Fees Expense") in Bayview's 1997 cost report did not violate any applicable Medicare regulation.

-19-

19. Mr. Fayollat did not believe any of the cost reports at issue in this case contained expense items that violated applicable Medicare regulations.

20. If Mr. Fayollat had concluded that any of the cost reports at issue in this case contained expense items that violated Medicare regulations, he would have so advised Bourseau and Sabaratnam.

21. Mr. Fayollat never advised Bourseau or Sabaratnam that any of the expense items included in the cost reports at issue in this case violated any Medicare regulations or were illegal in any way.

22. Simultaneously with the submission of Bayview's 1997 cost report, Defendants advised Mutual in writing that the report included as reimbursable costs the Financing Interest Expense and the Bankruptcy Legal Fees Expense and specifically explained Defendants' rationale for including those costs.

23. On June 15, 1999, PHM submitted Bayview's 1998 cost report to Plaintiff through Mutual.

24. Accompanying Bayview's 1998 cost report was a June 15, 1999 transmittal letter in which Defendants again highlighted for Mutual in writing, among other things, the inclusion of the full amount of the Financing Interest Expense.

25. Because of a significant increase in the number of patients requiring treatment through Bayview's Partial Hospitalization Program, additional square footage of Bayview's facilities was utilized for patient care and was included as an expense item in Bayview's 1998 and 1999 cost reports.

26. On July 27, 2000, PHM submitted Bayview's 1999 cost report to Plaintiff through Mutual.

27. When a cost item appears in the "protested" category or otherwise disclosed in a Medicare cost report, it is considered a "below the line" entry and has no effect on any estimated amount owing by or to the provider.

28. Bourseau signed Bayview's 1997-1999 Medicare cost reports in reliance on the belief that Mr. Fayollat and PHM prepared the reports in full compliance with all applicable Medicare laws and regulations.

-20-

29. All expense items contained in the subject cost reports were directly or indirectly related to Bayview's costs of providing medical services.

30. Bourseau and Sabaratnam provided a variety of management services to Bayview for which they were reimbursed in amounts previously approved by the court in the CPMS bankruptcy proceedings.

31. Plaintiff knew of the facts giving rise to its fraud and unjust enrichment claims no later than July 7, 1999 when Mutual received a memorandum from David J. Clingo (Bayview's Vice President of Finance) purporting to detail fraud in Bayview's 1997 and 1998 costs reports.

32. Defendants were not the alter egos of one another, nor was there any conspiracy between, or involving, the Defendants to file improper Medicare cost reports.

33. Defendants did not knowingly submit to Plaintiff improper Medicare cost reports. To the contrary, the cost reports were, as indicated previously, accompanied by transmittal letters which specifically informed Plaintiff's agent, Mutual, to the various cost items now in dispute and the rationale for their inclusion.

34. Defendants were not unjustly enriched. For example, not only were the Bankruptcy Legal Fees approved by the Bankruptcy Court, Defendants were never personally obligated to pay such fees nor did they ever receive such payments. Similarly, in regard to the Financing Interest Expense, CPMS not only intended to pay the interest (as evidenced by the substantial interest payments actually made), Defendants were not personally obligated to pay the interest in the event CPMS was unable to do so. In so far as management fees were concerned, while Defendants (as senior executives) did not punch a time clock, they did perform substantial and valuable personal services.

35.   The Medicare FI is supposed to assist a provider with the interpretation of the Medicare reasonable cost principles in connection with the filing and review of a provider's cost reports.

36.   The amount owing a provider by the Program or the amount owing the program by a provider cannot be actually determined until the FI completes the final settlement of the cost report, which is then subject to appeal to the PRRB.

37.   The final settlement process was not completed here for any of the three cost reports because the FI chose to terminate processing the cost reports.

38.   A provider cannot preserve its right to claim costs it believes it is entitled to unless it includes the costs in the cost report even if the costs are considered by the FI to be nonallowable or nonreimbursable.

39.   The FI made no adjustments to the past or future payments to Bayview as a result of receiving the cost reports at issue.

40.   Because the cost reports were never finally settled in this case and Bayview was never given a right to pursue an appeal of any potential disallowances of any costs in this case, one must speculate on whether the costs at issue here would have ultimately been allowed in whole or in part.

41.   The costs at issue here are similar to costs claimed by other providers on cost report disputes that have been processed through the PRRB and into court.

42.   The FI's termination of the cost report settlement process in this case makes it impossible to determine whether the "claims" at issue are false or fraudulent.

43.   The inclusion or reporting of the costs at issue in the cost reports at issue did not alter the actual payments made to Bayview by the FI and did not alter the FI's collection of any money from Bayview.

-22-

VII.

EXHIBITS

The exhibits to be offered at the trial, together with a statement of all admissions by and all issues between the parties with respect thereto, are as follows:

A.    Plaintiff's Exhibits

      *See* Tab 1.

B.    Defendants' Exhibits

      *See* Tab 2.

VIII.

WITNESSES

The witnesses that the parties expect to offer at trial are as follows:

A.    Plaintiff's Witnesses

      1.    Robert Bourseau (defendant)

      2.    Judith Brennan

      3.    John Carvelli

      4.    David Clingo

      5.    Angela DiGiorgio Havrilla (expert)

      6.    Jim Dierker

      7.    Emelina Estrella

      8.    Paul Fayollat

      9.    Dean Haberkamp

      10.   Chuck Jennings

      11.   Mary Kiteley

      12.   Loretta Masi

-23-

13.   Kathy McNamara (expert)

14.   Seth Morriss

15.   Charles Potter (expert)

16.   Roy Rodriguez

17.   Dewight Roe

18.   Dr. Rudra Sabaratnam (defendant)

19.   Miles Waggoner

20.   Eileen Zimmer

21.   Custodian(s) of records, including but not limited to custodians from Mutual of Omaha, United Government Services, and Rush Properties.

22.   Employee from Mutual of Omaha's Information Technology Department (regarding Mutual of Omaha's computer system)

23.   Employee from Health Financial Systems (Mutual of Omaha vendor regarding Mutual of Omaha's cost report software)

24.   Government employee(s) to authenticate investigative tape recordings

B.   Defendants' Witnesses

1.   Robert I. Bourseau

2.   David Clingo

3.   Robin Cowles

4.   Paul Fayollat

5.   Vicki Gant

6.   Marlene Hokuf

7.   Mary Kiteley

8.   Loretta Masi

9.   Seth Morriss

-24-

10.     Dr. Rudra Sabaratnam

IX.

ISSUES OF LAW TO BE LITIGATED

The following issues of law, and no others, remain to be litigated upon the trial:

A.      Disputed Issues of Law

        i.      1997 Medicare Cost Report

The False Claims Act (31 U.S.C. § 3729):

1.      Whether, based upon a preponderance of the evidence, the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management Services, Inc.; and Navatkuda, Inc.):

(a)     "knowingly" presented or caused to be presented "a false or fraudulent claim" for payment or approval in violation of 31 U.S.C. § 3729(a)(1);

(b)     "knowingly" made, used or caused to be made or used "a false record or statement" to get a "false or fraudulent claim" paid or approved in violation of 31 U.S.C. § 3729(a)(2);

(c)     conspired to defraud the Government by getting a "false or fraudulent claim" paid in violation of 31 U.S.C. § 3729(a)(3); or

(d)     "knowingly" made, used or caused a false record or statement to be made to "conceal, avoid, or decrease an obligation" to pay the Government in violation of 31 U.S.C. § 3729(a)(7);

when the 1997 Medicare Cost Report for Bayview Hospital submitted to Medicare's designated fiscal intermediary, Mutual of Omaha ("Mutual"), included: (i) an interest claim of $2,550,772 that decreased the amount Bayview owed to Medicare by $1,494,753[1]; and/or (ii) a claim of bankruptcy legal fees

---

[1]  The Court's November 2, 2005 Order granting in part and denying in part the Government's motion for partial summary judgment held, as a matter of law, that the Defendants caused the

(continued...)

of $1.3 million that decreased the amount Bayview owed Medicare by $636,208?

Unjust Enrichment:

2.       Whether, based upon a preponderance of the evidence, the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management, Inc.; and Navatkuda, Inc.) received a financial benefit that the Defendant was not entitled to receive when, in connection with Bayview's 1997 cost report, Bayview decreased the amount it owed to Medicare by: 1) $1,494,753 as a result of the $2,550,772 interest claim included on Bayview's 1997 Medicare Cost Report; and/or (b) $636,208 as a result of the $1.3 million claim for bankruptcy legal fees included on Bayview's 1997 Medicare Cost Report? Whether, and in what amount, the United States is entitled to prejudgment interest?

Common Law Fraud:

3.       Whether, based upon a preponderance of the evidence, the inclusion on Bayview's 1997 Medicare cost report of: (a) an interest claim of $2,550,772; and/or (b) bankruptcy legal fees of $1.3 million; constituted a fraudulent misrepresentation; that the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management, Inc. and Navatkuda, Inc.)   had knowledge of the falsity of that claim; that there was an intent to induce the Government's reliance on the misrepresentation; that the Government's reliance on the representation was reasonable; and that the Government suffered actual damages?   Whether, and in what amount, the United States is entitled to prejudgment interest?   Whether, and in what amount, the United States is entitled to compensatory and punitive damages?

ii.       1998 Medicare Cost Report

---

[1]/(...continued)
presentment of the alleged interest claims.  Accordingly, the United States need not introduce any evidence at trial regarding presentment of the 1997 (or 1998) interest claims.

The False Claims Act (31 U.S.C. § 3729):

1.       Whether, based upon a preponderance of the evidence, the relevant defendant (i.e., Robert I. Bourseau, Rudra Sabaratnam, RIB Medical Management Services, Inc. and Navatkuda, Inc.):

   (a)      "knowingly" presented or caused to be presented "a false or fraudulent claim" for payment or approval in violation of 31 U.S.C. § 3729(a)(1);

   (b)      "knowingly" made, used or caused to be made or used "a false record or statement" to get a "false or fraudulent claim" paid or approved in violation of 31 U.S.C. § 3729(a)(2);

   (c)      conspired to defraud the Government by getting a "false or fraudulent claim" paid in violation of 31 U.S.C. § 3729(a)(3); or

   (d)      "knowingly" made, used or caused a false record or statement to be made to "conceal, avoid, or decrease an obligation" to pay the Government in violation of 31 U.S.C. § 3729(a)(7);

when the 1998 Medicare Cost Report for Bayview Hospital submitted to Medicare's designated fiscal intermediary, Mutual, included:  (i) an interest claim of $2,761,803 that decreased the amount Bayview owed to Medicare by $1,807,880; and/or (ii) a claim of bankruptcy legal fees of $180,000 that decreased the amount Bayview owed to Medicare by $112,303; and/or (iii) a rent expense for a claimed lease that decreased the amount Bayview owed to Medicare by $414,618; and/or (iv) a claim of an additional 16,965 square feet for the Bayview partial hospitalization program that decreased the amount Bayview owed to Medicare by $279,899; and/or (v) $600,000 in management fees paid by Bayview to Defendants RIB Medical Management Services, Inc. and Navatkuda, Inc. and another entity that decreased the amount Bayview owed to Medicare by $569,541?

Unjust Enrichment:

2.  Whether, based upon a preponderance of the evidence, the relevant Defendant (i.e., Robert I. Bourseau, Rudra Sabaratnam, RIB Medical Management Services, Inc. and Navatkuda, Inc.) received a financial benefit that the Defendant was not entitled to receive when, in connection with Bayview's 1998 Medicare cost report, Bayview decreased the amount it owed to Medicare by: (a) $1,807,880 as a result of the $2,761,803 interest claim included on the cost report; and/or (b) $112,303 as a result of the claim for bankruptcy legal fees of $180,000 included on the cost report; and/or (c) $414,618 as a result of the claim of a rent expense for a claimed lease included on the cost report; and/or (d) $279,899 as a result of the claim of an additional 16,965 square feet for the Bayview Hospital partial hospitalization program included on the cost report; and/or (e) $569,541 as a result of the claim of management fees paid by Bayview to Defendants RIB Medical Management Services, Inc. and Navatkuda, Inc. and another entity? Whether, and in what amount, the United States is entitled to prejudgment interest?

Common Law Fraud:

3.  Whether, based upon a preponderance of the evidence, the inclusion on Bayview's 1998 Medicare cost report of: (a) an interest claim of $2,761,803; and/or (b) bankruptcy legal fees of $180,000; and/or (c) rent expense for a claimed lease; and/or (d) an additional 16,965 square feet for the Bayview partial hospitalization program; and/or (e) management fees paid by Bayview to Defendants RIB Medical Management Services, Inc. and Navatkuda, Inc. and another entity; constituted a fraudulent misrepresentation; that the relevant Defendant had knowledge of the falsity of that claim; that there was an intent to induce the Government's reliance on the misrepresentation; that the Government's reliance on the representation was reasonable; and that the Government suffered actual damages?   Whether, and in what amount, the

-28-

United States is entitled to prejudgment interest?   Whether, and in what amount, the United States is entitled to compensatory and punitive damages?

iii.   1999 Medicare Cost Report

The False Claims Act (31 U.S.C. § 3729):

1.   Whether, based upon a preponderance of the evidence, the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management Services, Inc.; and Navatkuda, Inc.):

(a)   "knowingly" presented or caused to be presented "a false or fraudulent claim" for payment or approval in violation of 31 U.S.C. § 3729(a)(1);

(b)   "knowingly" made, used or caused to be made or used "a false record or statement" to get a "false or fraudulent claim" paid or approved in violation of 31 U.S.C. § 3729(a)(2);

(c)   conspired to defraud the Government by getting a "false or fraudulent claim" paid in violation of 31 U.S.C. § 3729(a)(3); or

(d)   "knowingly" made, used or caused a false record or statement to be made to "conceal, avoid, or decrease an obligation" to pay the Government in violation of 31 U.S.C. § 3729(a)(7);

when the 1999 Medicare Cost Report for Bayview Hospital submitted to Medicare's designated fiscal intermediary, Mutual, included: (i) bankruptcy legal fees of $94,666 that decreased the amount Bayview owed to Medicare by $53,535; and/or (ii) $630,000 in management fees paid by Bayview to Defendants RIB Medical Management, Inc. and Navatkuda, Inc. and another entity that decreased the amount Bayview owed to Medicare by $356,395; and/or (iii) the additional 16,965 square feet that was claimed to have been used for the Bayview partial hospitalization program that decreased the amount Bayview owed to Medicare by $135,521; and/or (iv) "program costs" that decreased the amount Bayview owed to Medicare by $190,571?

Unjust Enrichment:

2.     Whether, based upon a preponderance of the evidence, the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management, Inc.; and Navatkuda, Inc.) received a financial benefit that the Defendant was not entitled to receive when, in connection with Bayview's 1999 cost report, Bayview decreased the amount it owed to Medicare by: (a) $53,535 as a result of the claim for bankruptcy legal fees of $94,666; and/or (b) $356,395 as a result of the claim for management fees paid by Bayview to Defendants RIB Medical Management, Inc. and Navatkuda, Inc. and another entity; and/or (c) $135,521 as a result of an additional 16,965 square feet that was claimed to have been used for the Bayview partial hospitalization program; and/or (d) $190,571 as a result of the claim for "program costs"? Whether, and in what amount, the United States is entitled to prejudgment interest?

Common Law Fraud:

3.     Whether, based upon a preponderance of the evidence, the inclusion on Bayview's 1999 Medicare cost report of: (a) bankruptcy legal fees of $94,666; and/or (b) management fees paid by Bayview to Defendants RIB Medical Management, Inc. and Navatkuda, Inc. and another entity; and/or (c) the additional 16,965 square feet that was claimed to have been used for the Bayview partial hospitalization program; and/or (d) "program costs"; constituted a fraudulent misrepresentation; that the relevant Defendant (i.e., Robert I. Bourseau; Rudra Sabaratnam; RIB Medical Management, Inc. and Navatkuda, Inc.) had knowledge of the falsity of that claim; that there was an intent to induce the Government's reliance on the misrepresentation; that the Government's reliance on the representation was reasonable; and that the Government suffered actual damages? Whether, and in what amount, the United States is entitled to prejudgment interest? Whether, and in what amount, the United States is entitled to compensatory and punitive damages?

iv.     <u>Related Parties</u>

1.      Whether RIB and Navatkuda were related parties to Bayview in 1998 and 1999?

2.      Whether the NCFE entity that received management fees which were claimed in Bayview's 1998 and 1999 cost reports was a related party to Bayview from March through December 1998, and in 1999?

    v.    <u>Penalties</u>

1.      Whether each of the 1997, 1998, and 1999 cost reports is a separate violation of the False Claims Act, and consequently each is subject to a penalty under the False Claims Act?

    vi.   <u>Statute of Limitations</u>

1.      Whether the United States' False Claims Act and Unjust Enrichment counts were filed within the applicable six year period?

2.      Whether the United States' Common Law Fraud count was filed within the applicable three year period due to the tolling provision of 28 U.S.C. § 2416(c)?

    vii.  <u>Defendants' Contentions of Law</u>

1.      To prevail on its False Claims Act claims, Plaintiff must prove, among other things, that (a) the challenged expense items in the subject cost reports for Bayview were false; and (b) Defendants acted with scienter. *United States ex. rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428, 450-451 (6th Cir. 2005).

2.      To prevail on its False Claims Act claims, Plaintiff must prove, among other things, 1) materiality, 2) whether the cost reports are claims for "payment or approval," under (a)(1), (2), and (3), 3) the existence of an "obligation" for (a)(7) liability, 4) causation, and 5) actual damages.

3.      To establish the scienter element of its False Claims Act claims, Plaintiff must prove that Defendants included the challenged expense items in Bayview's cost reports knowing they were false (i.e., a lie). *Pfingston v. Ronan Engineering*

-31-

*Company*, 284 F.3d 999, 1003 (9th Cir. 2002); *United States ex. rel. Oliver v. Parsons Company*, 195 F.3d 457, 464 (9th Cir. 1999); *United States ex. rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998); *United States ex. rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).

4.   To prevail on its common law fraud claim, Plaintiff must prove that (i) Defendants made a misrepresentation which they knew to be false; (ii) Defendants made the misrepresentation with the intent to defraud; (iii) Plaintiff justifiably relied on the misrepresentation; and (iv) Plaintiff sustained damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996); *Lovejoy v. AT&T Corporation*, 92 Cal.App.4th 85, 93 (2001).

5.   To recover punitive damages in connection with its state law claim for fraud, Plaintiff must prove by clear and convincing evidence that Defendants acted with malice, fraud or oppression.  California Civil Code Section 3294(a).

6.   To prevail on its unjust enrichment claim, Plaintiff must prove that (i) Defendants received a benefit; and (ii) Defendants unjustly retained the benefit at the expense of another. *Lectrodryer v. Seoulbank*, 77 Cal.App.4th 723, 726 (2000).

7.   42 U.S.C. Section 1395f(b) provides that to qualify for reimbursement, a cost item must be (i) for a Medicare-covered service, (ii) related to patient care, and (iii) reasonable.   Nothing in Section 1395f(b), or in any other statute or Medicare regulation, prohibits a provider from including costs of patient care based upon the physical location where the medical services happen to be provided.

-32-

8.     42 C.F.R. 413.9(c)(1) expresses a legislative intent that "payments to providers of [Medicare] services should be fair to the providers." Defendants' essential contention is that if reimbursement of costs associated with the treatment of Medicare patients were disallowed merely because of where medical services were provided (i.e., the physical location), Plaintiff would have been unjustly enriched.

9.     Medicare regulations authorize a provider to be reimbursed for costs incurred by a related organization. *Rio Hondo Memorial Hospital v. United States*, 689 F.2d 1025, 1029 (Ct. of Claims 1982); 20 C.F.R. § 405.427(a); 20 C.F.R. § 405.427(c)(2).

10.     The Medicare Provider Reimbursement Manual does not have the binding effect of law or regulation and was "never intended to establish Medicare policy." *Providence Hospital of Toppenish v. Shalala*, 52 F.3d 213, 218 (9th Cir. 1995); *National Medical Enterprises v. Bowen*, 851 F.2d 291, 293 (9th Cir. 1988).

11.     A fiscal intermediary's knowledge is imputed to the Government for purposes of commencing the statute of limitations. *United States v. Kass*, 740 F.2d 1493, 1497-1498 (11th Cir. 1984).

12.     Plaintiff's fraud claim is governed by a three year statute of limitations. 28 U.S.C. Section 2415(b).

13.     It is not necessary that relevant government officials have all details of a claim before the statutory period begins to run. Once the facts making up the 'very essence of the right of action' are reasonably knowable, the tolling provision set forth in 28 U.S.C. § 2416 bar is dropped. *Kass*, 740 F.2d at 1497. Since Plaintiff was aware of alleged facts supporting the so-called fraudulent conduct

-33-

as of July 7, 1999, and delayed commencing this action until May 6, 2003, the fraud claim is time-barred.

14. A provider must claim particular costs, including nonallowable costs, in its Medicare cost reports to be able to preserve its right to appeal any disallowance of such costs by a Medicare fiscal intermediary. PRM-II, § 115.

15. Congress established the Provider Reimbursement Review Board ("PRRB") in 1972 to resolve Medicare reasonable cost reimbursement disputes. 42 U.S.C. § 1395oo.

16. A Medicare fiscal intermediary is prohibited from making an adjustment to a provider's interim payments (past, current or future) if a provider is involved in bankruptcy proceedings or is insolvent. PRM-I, § 2408.2.

17. Medicare reasonable cost reimbursement principles require reimbursement of a provider's direct and indirect costs of providing services, including such indirect costs as normal standby costs. 42 U.S.C. § 1395x(v)(1)(A), and 42 C.F.R. § 413.5(a).

18. Reimbursement is required to be made for a provider's actual costs even though such costs vary from one provider to another. 42 C.F.R. § 413.9(a).

19. In order to disallow costs, including management expenses, for being unreasonable in amount, a fiscal intermediary must compare the providers' costs with those of comparable providers through a survey or some other means as part of the settlement process. See *Memorial Hosp/Adair Cty. Health Center v. Bowen*, 829 F.2d 111 (D.C. Cir. 1987).

20. Unused space costs may be considered as normal standby costs under a variety of circumstances. See, for example, *Lincoln West Medical Center v. Blue Cross/Blue Shield Association*, PRRB Dec. No. 92-D61, Medicare & Medicaid Guide (CCH), para. 41,031.

21. Bankruptcy fees, such as legal fees, incurred by a provider are allowable Medicare costs to the extent they had to be incurred by a provider to continue to be able to operate. See PRM-I, § 2183.

22. Accounts receivable financing expenses are allowable costs under appropriate circumstances. PRM-I, § 219.

23. Costs required to be incurred by a provider to continue to operate may be allowable costs even if they pertain to services or items not furnished to Medicare patients. *Vista Hill Foundation v. Heckler*, 767 F.2d 556 (9th Cir. 1985).

24. Expenses accrued by a provider under generally accepted accounting principles may be considered "incurred" by the provider even if they are not actually paid or liquidated during a particular cost reporting period or shortly thereafter. See *National Medical Enterprises v. Bowen*, 851 F.2d 291 (9th Cir. 1988) and *Queen's Medical Center v. Blue Cross*, PRRB Dec. No. 91-D2, Medicare & Medicaid Guide (CCH), para. 38,928.

25. A provider must include in its cost report, costs that are seemingly not allowed under a Medicare regulation if it intends to challenge the regulation through the appeal process. See *PIA-Asheville, Inc. v. Bowen*, 850 F.2d 739 (D.C. Cir. 1988), where a provider successfully challenged a fiscal intermediary's disallowance of costs based on the application of a Medicare regulation.

26. When a provider purchases the services from a related organization, the cost incurred by the provider may be allowed notwithstanding the fact that the organization may be related to the provider if the organization regularly is engaged in the activity in question with other entities. 42 C.F.R. § 413.17(d).

-35-

27.     Courts have held that the Medicare related organization principle only applies if the parties were related at the time the "loan" was negotiated. See *Northwest Community Hospital, Inc. v. Califano*, 442 F.Supp. 949 (S.D. Iowa 1977).

28.     If a provider leases space to or from a related organization, the provider is entitled to be reimbursed for the underlying cost of the space. 42 C.F.R. §§ 413.17 and 413.130.

29.     The final, as opposed to estimated or tentative amount owing to or by a provider at any one time, cannot be determined until the final settlement of the provider's cost report. 42 C.F.R. §§ 413.60 and 413.64, and *Good Samaritan Hospital v. Shalala*, 508 U.S. 402 (1993).

30.     Under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., the court ordinarily must determine, as a matter of law, whether a claim is false to the extent the claim depends on the interpretation of a regulation or contract provision. *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999).

31.     In the context of Medicare reasonable cost reimbursement, a cost report entry cannot be false as a matter of law if it is based on the interpretation of a Medicare cost reporting rule about which reasonable minds might differ. *U.S. v. Whiteside*, 285 F.3d 1345 (11th Cir.2002).

32.     Where a "claim" does not actually request payment from the government, it is not actionable under the FCA provisions, 31 U.S.C. § (a)(1), (2), or (3). *U.S. v. Southland Management Corp.*, 326 F.3d 669, 675 (5th Cir. 2003), and *U.S. v. Kitsap*, 314 F.3d 995, 1002 (9th Cir.2002).

33.     A claim which did not request payment from the government did not become actionable until the FCA was amended in 1986 to add subsection (a)(7), the so-

-36-

called "reverse claim" provision of the FCA. *Rabushka ex rel. U.S. v. Crane Co.*, 122 F.3d 559, 565, n. 8 (8th Cir. 1997), citing with approval *United States v. Howell*, 318 F.2d 162, 166 (9th Cir. 1953).

34. The FCA is not designed to reach every kind of fraud practice on the government. *Mikes v. Straus*, 274 F.3d 687, 689 (2nd Cir. 2001).

35. There can be no conspiracy under 31 U.S.C. § 3729(a)(3) without a claim for payment being submitted. *U.S. v. Kitsap, supra.*

36. A reverse false claim is not actionable unless there was a preexisting, binding obligation as opposed to an estimated or potential liability. *United States v. Q International Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997).

37. There is no binding obligation on a provider regarding costs claimed in the cost report until the cost report is finally settled. *Good Samaritan Hosp. v. Shalala, supra.*

38. The government has the burden of proving actual damages or loss under the FCA. 31 U.S.C. § 3731(c).

39. If the government is unable to prove actual damages or loss, it is entitled only to penalties at most. *Bly-Magee v. California*, 236 F.3d 1014 (9th Cir. 2001).

40. The decision of the Sixth Circuit Court of Appeals in *Homecare v. Medshares Management*, 400 F.3d 428 (6th Cir. 2005), incorrectly holds that the measure of damages in a Medicare reverse false claims case is determined by the net effect on Medicare reimbursement ultimately estimated to be owing a provider based on a particular entry rather than the actual amount paid out by the government or the actual amount not collected from the provider, as triggered by the filing of the cost report.

41. Most Courts of Appeals have concluded that the FCA contains a materiality requirement. *Homecare v. Medshares Management*, 400 F3d at 441-446.

42. Neither the government nor the Medicare fiscal intermediary may indefinitely suspend or terminate the Medicare appeal process simply because the government is pursuing a fraud action against a provider in federal court. *U.S. ex rel. Rahman v. Oncology Associate, P.C.*, 201 F.3d 277 (4th Cir. 1999).

43. The provider and related parties have a statutory and regulatory (42 C.F.R. § 405.1843) right to use the PRRB adjudicatory procedures of which the government may not summarily deprive the provider or related parties without giving them notice and an opportunity to be heard. Compare *Logan v. Zimmermon Brush Co.*, 455 U.S. 422, 429-432 (1982).

44. To remedy the deprivation of a provider's or its related parties' right to use the PRRB's adjudicatory procedures the court has inherent authority to transfer the matter to the PRRB for an initial ruling on the cost report issues in question. Compare *U.S. v. Universal Fruits and Vegetables Corp.*, 370 F.3d 829 (9th Cir. 2004) [court transfers FCA case to Court of International Trade to resolve issues within the latter court's exclusive jurisdiction.]

45. The government's unilateral termination of the Medicare cost report settlement process for Bayview's 1997, 1998, and 1999 fiscal years, before each cost report had been finally settled, deprived Bayview and defendants of their right to have the allowability of the costs at issue determined by the PRRB based upon the PRRB's interpretation of the applicable Medicare statutes and regulations, a right afforded them under federal law, 42 U.S.C. § 1395oo.

46.     Generally, a party's mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish "causation" under the FCA. *U.S. v. President and Fellows of Harvard College*, 323 F. Supp. 2d 151, 186 (D. Mass. 2004).

47.     Any award of damages, especially treble damages, in this case would violate the Eighth Amendment's prohibition against excessive fines since the government did not actually pay Bayview or defendants or refrain from collecting from Bayview or defendants any sums in response to the submission of the 1997, 1998, and 1999 cost reports. *U.S. v Mackby*, 261 F. 3d 821, 829-831 (9th Cir. 2001).

viii.   Plaintiff's Contentions of Law[2]

1.      "When you file a cost report under protest, the disputed item and amount for each issue must be specifically identified in footnotes to the settlement worksheet and the fact that the cost report is filed under protest must be disclosed." PRM § 115.1. "If you deliberately include cost, without disclosing the fact, in the provider cost report that is nonreimbursable under the regulations you are subject to those provisions concerning suspected fraud or abuse." PRM § 115.3.

2.      Congress established the Provider Reimbursement Review Board ("PRRB") in 1972 to resolve Medicare reasonable cost reimbursement disputes where providers are dissatisfied with final determinations of the fiscal intermediary or

---

[2]The preceding Defendants' Contentions of Law are irrelevant and should be deleted from this Joint Pretrial Order: Numbers 14-21, 23-26, 28-37, 40, 42-46. However, in the event these contentions are not deleted from the Joint Pretrial Order, the United States hereby adds the following 23 Contentions of Law in response to Defendants' Contentions.

the Secretary and the provider requests a hearing within a limited time period.

42 U.S.C. § 1395oo.

3. Tentative retroactive adjustments are not made when the "[i]ntermediary knows at the time the cost report is received and reviewed that the provider is insolvent under the law of the State in which it is located or that a petition of bankruptcy or insolvency is pending against the provider in any State or Federal court..."  When this condition exists, "any retroactive adjustments necessary on the cost report are made at the time the cost report is settled." PRM § 2408.2.

4. "All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries." 42 CFR § 413.9 (b)(1).  "The provision in Medicare for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another."  42 CFR § 413.9(c)(2).

5. "Legal fees and related costs incurred by provider are allowable if related to the provider's furnishing of patient care . . ." PRM § 2183.

6. "If [accounts receivable financing] is a loan, the interest incurred on the loan is an allowable expense if it is necessary and proper as defined in §§ 202.1, 202.2, and 202.3." PRM § 219.

7. Expenses for providing educational services to children in a psychiatric hospital, where the expenses were required by the Joint Commission for the Accreditation of Hospitals, and which were routine costs of the hospital, were

-40-

held to be reimbursable by Medicare.  *See Vista Hill Foundation v. Heckler*, 767 F. 2d  556 (9th Cir. 1985).

8.    The Secretary of Health and Human Services' regulations do not require reimbursement according to GAAP.  *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995).   Where Medicare cost determinations are covered by regulation or guideline such as the Provider Reimbursement Manual, GAAP principles do not apply.  *Id., see also, Providence Hospital of Toppenish*, 52 F.3d 213 (9th Cir. 1995).  "A short term liability, including the current portion of a long term liability (for example, mortgage interest payments due to be paid in the current year), must be liquidated within 1 year after the end of the cost reporting period in which the liability is incurred." 42 CFR § 413.100(c)(2)(i)(A).

9.    "While it is true that a provider may submit claims for costs it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement. Nothing less is required if the Medicare reimbursement system is not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud on the government." *United States v. Calhoun*, 97 F.3d 518, 529 (11th Cir. 1991).

10.   "An exception is provided to this general principle (related party principle) if the provider demonstrates by convincing evidence to the satisfaction of the fiscal intermediary . . . that - (i) The supplying organization is a bona fide separate

-41-

organization; (ii) A substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier by common ownership or control and there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization; (iii) The services, facilities, or supplies are those that commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions; and (iv) The charge to the provider is in line with the charge for such services, facilities, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such services, facilities, or supplies." 42 C.F.R. § 413.17(d).

11. "Except as provided in paragraph (d) of this section, costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization." 42 C.F.R. § 413.17(a).

12. The United States may recover damages for false claims reported on a Medicare cost report even in the absence of the final administrative settlement of a provider's cost report. *United States ex rel A+ Homecare, Inc. v. Medshares Management Group, Inc.*, 400 F.3d 428 (6th Cir. 2005). "Medicare regulations establish the NPR as an administrative mechanism to make 'necessary

-42-

adjustments due to previously made overpayments or underpayments' not as a remedial mechanism for fraud." *Id.*, at 456. The United States may recover Medicare overpayments through common law actions even in the absence of the final administrative settlement of a provider's cost report. *See, e.g., United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 12 (1st Cir. 2005) (concluding that the existence of the False Claims Act "expresses a clear congressional intent to provide several avenues for the United States to recover monies owed to it and not to limit the means of recovery to those promulgated by the Secretary in the Medicare Act"); *United States v. Tenet Healthcare Corp.*, 343 F. Supp.2d 922, 926 (C.D. Cal. 2004) (Medicare's "comprehensive regulatory scheme was developed to provide due process protections to providers whose claims for reimbursement were denied by the government . . . [t]he objective of the scheme, however, provides no support for the proposition that it therefore precludes the government from seeking relief for overpayments in federal court under the False Claims Act or the common law").

13. The meaning of a Medicare regulation is ultimately the subject of judicial interpretation. *U.S. ex rel. Oliver v. Parsons Company*, 195 F. 3d. 457, 460 (9th Cir. 1999). A defendant's compliance with a Medicare regulation is decided by the jury. *Medshares.*

14. While the reasonableness of a defendant's interpretation of the applicable standard "may be relevant to whether it knowingly submitted a false claim, the question of 'falsity' itself is determined by whether [defendant's]

-43-

representation was accurate in light of the applicable law." *U.S. ex rel. Oliver v. The Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999), *cert. denied*, 120 S. Ct. 2657 (2000).

15. "The amounts claimed in Bayview's cost reports, if exaggerated, were claims for payment from Medicare or decreasing Defendants' financial obligations to Medicare." October 31, 2005 Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment, at 5; *see, also, Medshares.*

16. "The FCA 'was intended to reach all types of fraud, without qualification, that might result in a financial loss to the Government.'" *United States v. Neifert-White Co.*, 390 US 228, 232 (1968).

17. Liability for conspiracy under the FCA attaches to any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . ." 31 U.S.C. § 3729(a)(3).

18. "When the provider files a cost report indicating that an overpayment occurred a full refund is to be remitted with the report." PRM § 2409.1 (2).

19. The United States contends that the Medicare appeal process is not relevant to this case. In addition, "The statutes and regulations governing the Medicare Part B program, however, do not preclude the United States from bringing an independent action in federal court to litigate claims under statutes such as the False Claims Act . . . or related common law claims . . . ." *United States ex. rel. Rahman v. Oncology Assiciates, P.C.*, 201 F.3d 277, 288 (4th Cir. 1999).

-44-

20.    The United States contends that the PRRB procedures are not relevant to this case. In addition, "Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board .... if (1) such provider ... (ii)(B) has not received such final determination from such intermediary on a timely basis after filing such report, where such report complied with the rules and regulations of the Secretary relating to such report.... and... 3) such provider files a request for hearing ... within 180 days after notice of such determination would have been received if such determination had been made on a timely basis." 42 U.S.C. § 1395oo(a). "The request for a Board hearing must be filed in writing with the Board within 180 days of the date the notice of the intermediary's determination was mailed to the provider or, where notice of the determination was not timely rendered, within 180 days after the expiration of the period specified in § 405.1835(c)." 42 CFR 405.1841(a)(1). The "provider also has a right to a hearing before the Board if an intermediary's determination concerning the amount of reasonable cost reimbursement due a provider is not rendered within 12 months after receipt by the intermediary of a provider's perfected cost report or amended cost report... provided such delay was not occasioned by the fault of the provider." 42 C.F.R. § 405.1835(c) .

21.    The Medicare Act's jurisdictional provisions, 42 U.S.C. §§ 405(g) and 405(h), do not bar the United States from seeking to recover damages for false claims

-45-

under the FCA and Medicare overpayments under the common law. *United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1 (1st Cir. 2005); *United States v. Tenet Healthcare Corp.*, 343 F. Supp.2d 922, 926 (C.D. Cal. 2004).

22.   The United States contends that the Medicare cost report settlement process is not relevant to this case.

23.   "Plaintiff has established that Defendants caused the presentment of the alleged claims."  October 31, 2005 Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment, at 5.   "Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant knows of the false claims, yet does not cease doing business with the claimant or disclose the false claims to the United States, the defendant's ostrich-like behavior itself becomes 'a course of conduct that allowed fraudulent claims to be presented to the federal government.'" *U.S. v. President and Fellows of Harvard College*, 323 F.Supp. 2d 151,187 (D. Mass. 2004).

B.   The Medicare Program

1.   The Medicare statute and regulations define a provider of service as a specific type of health care facility including "a hospital." 42 U.S.C. § 1395x(u); 42 C.F.R. § 400.202.

2.   Medicare pays only for the costs of Medicare beneficiaries:  "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so

-46-

covered will not be borne by such insurance programs . . . ." Id.  One of the reasons that Medicare reimburses a hospital only for its own costs is to implement this statutory proscription.  See 42 C.F.R. § 413.50(b).

3.  To determine reimbursement amounts, Medicare apportions the provider's allowable indirect costs between Medicare patients and non-Medicare patients and then pays the share of the costs that relate to the Medicare patients.  42 C.F.R. § 413.50.

4.  An organization related to a provider by common ownership or control is a related party to the provider.  42 C.F.R. §§ 413.17(a); 413.17(b).  Costs applicable to services furnished to a provider by a related party are allowable only at the cost to the related party.  42 C.F.R. § 413.17(a).  Management contracts with related parties must be specifically identified in the cost report so the fiscal intermediary can determine whether the management costs reflect the costs to the related party, whether the costs are within the price of comparable services that may be purchased elsewhere, and whether the provider acted as a prudent buyer.  42 C.F.R. § 413.17(a); CMS Provider Reimbursement Manual 1 § 2135.3(A).

5.  Each hospital participates in the Medicare program by entering into an individual provider agreement with the Secretary of the Department of Health and Human Services (HHS).  42 U.S.C. § 1395cc.

6.  The statute further states that the "Secretary (of HHS) shall periodically determine the amount which should be paid under this part to each provider of

-47-

services with respect to the services furnished by it ...." 42 U.S.C. § 1395g(a) (emphasis added).

7. The regulations provide that "payment is to be made on the basis of current costs of the individual provider ...." 42 C.F.R. § 413.5(a) (emphasis added).

8. In addition, the regulations provide that "reimbursement under the Medicare program involves a determination of – (1) Each provider's allowable costs for producing services ...." 42 C.F.R. § 413.50(a)(1) (emphasis added).

9. As authorized by 42 U.S.C. § 1395h, HHS-CMS contracts with private insurance companies, referred to as "fiscal intermediaries," to pay providers of Part A services. The fiscal intermediaries pay providers using monies allocated by the United States from the Federal Hospital Insurance Trust Fund. *See* 42 U.S.C. § 1395i & 1395g.

10. The regulations further provide that fiscal intermediaries "will establish a basis for interim payments to each provider" based upon estimates. 42 C.F.R. § 413.60(a) (emphasis added). Further, "[a]t the end of the period, the actual apportionment, based upon the cost finding and apportionment methods selected by the provider, determines the Medicare reimbursement for the actual services provided to beneficiaries during the period." 42 C.F.R. § 413.60(b) (emphasis added).[3]

---

[3] "Medicare provides that providers of services will be paid amounts that are determined to be due to them, but not sooner than on a monthly basis, with necessary adjustments caused by previously made overpayments or underpayments. Interim payments are made on the basis of estimated costs submitted by the hospital to Medicare. Actual costs reimbursable to a provider cannot be determined (continued...)

11.    The fiscal intermediary uses the cost report to determine the total reimbursement actually due the provider for Medicare services that year.

12.    Shortly after receiving the provider's cost report, the fiscal intermediary makes a tentative adjustment or settlement of accounts for the cost-report year. The fiscal intermediary makes this adjustment by computing the difference between the interim amount received by the provider during the year and the amount determined from the cost report data to be the actual cost of services furnished to the Medicare patients. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.9(b)(1). This review determines whether the provider was overpaid during the year, thus owing money to Medicare, or underpaid, in which case the provider is due money from Medicare. The final adjustment or settlement occurs up to several years later after further detailed review of the cost report, which may include a full audit.

13.    The Provider Reimbursement Manual (PRM) "is an extensive set of informal interpretative guidelines and policies published (by the agency which administers the Medicare program) to assist intermediaries and providers in applying the reasonable cost reimbursement principles." <u>Providence Hospital of Toppenish v. Shalala</u>, 52 F.3d 213, 218 (9th Cir. 1995).

14.    The PRM defines a chain organization as "a group of two or more health care facilities which are owned, leased, or through any other device, controlled by

---

[3]/(...continued)
until the cost reports are filed and costs are verified. Therefore, a retroactive adjustment will be made at the end of the reporting period to bring the interim payments made to the provider during the period into agreement with the reimbursable amount payable to the provider for the services furnished to program beneficiaries during that period." 42 C.F.R. § 413.64(f).

one organization." PRM § 2150. "The home office of a chain is not a provider in itself; therefore, its costs may not be directly reimbursed by the program . . . To the extent the home office furnishes services related to patient care to a provider, the reasonable costs of such services are includable in the provider's cost report and are reimbursable as part of the provider's costs." PRM § 2150.

15. In allocating home office costs to the components of the chain, "[a]llowable costs incurred for the benefit of, or directly attributable to, a specific provider or nonprovider activity must be allocated directly to the chain entity for which they were incurred. For example, where such costs are paid by the home office, interest expense is allocated to the facility for which the loan was made . . . ." PRM § 2150.3(B).

16. Other legal obligations of participating providers are:

    a.    not to make false statements or misrepresentations of material facts concerning payment requests, 42 U.S.C. §§ 1320a-7b(a)(1)&(2); 42 U.S.C. § 1320a-7a(1); 42 C.F.R. § 413.24(f)(4)(iv); 42 C.F.R. § 1001.101(a)(1); and

    b.    to know the information contained in HHS-CMS and fiscal intermediary notices, including manual issuances, bulletins, and other written guides and directives, 42 C.F.R. § 411.406.

C.   Non-Disputed Issues of Law

1. During the relevant time period, Medicare reimbursed certain providers, such as psychiatric hospitals, based on the actual costs incurred by the provider for the treatment of Medicare patients. To qualify for reimbursement, the cost must be: (1) for a Medicare-covered service, (2) related to patient care, and (3) reasonable. 42 U.S.C. § 1395f(b); 42 C.F.R. § 413.9. A "reasonable cost" is the cost actually incurred by the provider for the service and excludes any part of

-50-

the cost that is unnecessary in the efficient delivery of needed health services. 42 U.S.C. § 1395x(v)(1)(A).

2.   Medicare does not reimburse providers for costs not incurred.  42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9(a).

3.   Reasonable costs include the provider's direct and indirect costs of patient care. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9.  Direct costs typically relate to the specific care of individual patients, while indirect costs, e.g., overhead, typically relate to the actual operation of the hospital.  42 C.F.R. § 413.9. Indirect costs include such expenses as the hospital's administrative and maintenance costs that are appropriate and helpful in developing and maintaining the operation of the facility.  42 C.F.R. § 413.9(b)(2) & (c)(3).

4.   Interest costs are reimbursable only if they are "necessary and proper."  42 C.F.R. § 413.153 (a)(1).  However, for interest to be necessary within the meaning of the regulations it must be (1) "incurred on a loan made to satisfy a financial need of the provider," and (2) "incurred on a loan made for a purpose reasonably related to patient care."  42 C.F.R. § 413.153(b)(2)(i), (b)(2)(ii) (emphasis added).  For interest to be proper within the meaning of the regulations, it must be paid "to a lender not related through control or ownership . . . to the borrowing organization."  42 C.F.R. § 413.153(b)(3)(ii).

5.   Medicare regulations also require that the interest cost be (1) supported by an agreement that funds were borrowed and that payment of interest and repayment of the funds are required, (2) identified in the provider's accounting records, (3) related to the reporting period in which the costs are incurred; and (4) necessary and proper for the operation, maintenance, or acquisition of the provider's facility.  *CMS Provider Reimbursement Manual 1 § 202.*

-51-

6.   The interest liability must be liquidated within one year after the end of the cost reporting period in which the liability is incurred.  42 C.F.R. § 413.100(c)(2)(i)(A); *CMS Provider Reimbursement Manual 1* § 2305.

7.   Once a provider is authorized by Medicare to render Part A services, the fiscal intermediary will pay the provider an interim amount periodically throughout the year that is based on estimated treatment costs for the provider's Medicare patients.  *See* 42 U.S.C. § 1395g(e).  At the end of the year, the provider submits a final accounting of its costs for the year to the fiscal intermediary in a document called a "cost report."  42 C.F.R. § 413.20(b).

8.   Federal regulations require Part A providers to furnish the fiscal intermediary with accurate and sufficient data to ensure proper payment.  42 C.F.R. § 413.24(c).

9.   The cost report is signed by the provider's administrator or chief financial officer.  The signing official must also certify that the report is "true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted"  42 C.F.R. § 413.24(f)(4)(iv).  The signing official further certifies familiarity with the laws and regulations regarding the provision of health care services and attests that the services identified in the cost report were provided in compliance with those laws and regulations.  Id.

X.

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

XI.

JURY

-52-

1    This case shall be tried by jury.

2                                                    XII.

3                                          BIFURCATION

4    The trial of this case shall not be bifurcated.[4]

5                                                   XIII.

6                                                 TIME

7    Time estimate for trial is 8 days.

8

9    DATED: _5/2/06_                    _____
                                        Honorable Roger T. Benitez
10                                      United States District Judge

11

12   APPROVED AS TO FORM AND CONTENT:

13   _____, AUSA              _____, AUSA

14   Robert McAuliffe                   Patric Hooper
     Attorney for Plaintiff             Attorney for Defendants
15   United States                      Robert I. Bourseau
                                        Rudra Sabaratnam
16                                      RIB Medical Management Services, Inc.
                                        Navatkuda, Inc.

17

18

19

20

21

22

23

24

25

26   _____
         [4]Defendants have filed motions for a separate trial of certain legal issues and a motion for a
27   separate trial of the unjust enrichment cause of action.  Plaintiff has filed oppositions to those motions.
                                                    -53-
28

United States' Exhibit List

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 1 | | | July 7, 1999 Letter from David Clingo to Emelina Estrella | Defs. | FRE 802 |
| 2 | | | May 29, 1998 Letter from Loretta Masi to Mutual of Omaha transmitting Bayview's Cost Report | | |
| 3 | | | 1997 Medicare Cost Report for Bayview Hospital | | |
| 4 | | | February 11, 1999 Letter from Emelina Estrella to Roy Rodriguez with attached audit adjustment report and notes | Defs. | FRE 802 |
| 5 | | | February 19, 1999 Loretta Masi's notes | | |
| 6 | | | February 22, 1999 Memorandum from Loretta Masi to David Clingo Re: NCFE interest schedule | Defs. | FRE 802 |
| 7 | | | May 28, 1998 Facsimile from Chuck Jennings to Loretta Masi Re: NCFE interest schedule | | |
| 8 | | | February 25, 1999 Letter from Roy Rodriguez to Emelina Estrella Re: Bayview 1997 proposed audit adjustments | | |
| 9 | | | April 15, 1999 Memorandum from Loretta Masi to David Clingo Re: Bayview 1998 Medicare Cost Report | Defs. | FRE 802 |

-1-

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 10 | | | April 30, 1999 Facsimile from Sandy Morriss to Loretta Masi Re: NCFE interest for 1998 | | |
| 11 | | | May 25, 1999 Facsimile from Sandy Morriss to Joan Hand Re: 1998 general ledger entries | | |
| 12 | | | June 15, 1999 Letter transmitting 1998 Bayview Cost Report | | |
| 13 | | | 1998 Medicare Cost Report for Bayview Hospital | | |
| 14 | | | August 9, 1999 Facsimile from David Clingo to Robert Bourseau transmitting two letters from Mutual of Omaha | | |
| 15 | | | July 27, 1999 Letter from Jacklyn Blue to Glenn Pelkey Re: Missing items for Bayview's 1998 Cost Report | | |
| 16 | | | November 11, 1999 Letter from Brian Nosaka to Glenn Pelkey Re: Supporting documentation for desk review of Bayview 1998 Cost Report | | |
| 17 | | | December 3, 1999 Letter from David Clingo to Mutual of Omaha with attached NCFE Interest schedule | | |
| 18 | | | January 14, 2000 Letter from Brian Nosaka to David Clingo with attached audit adjustment report and notes | | |

-2-

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 19 | | | February 3, 2000 Letter from David Clingo to Mutual of Omaha | Defs. | FRE 802 |
| 20 | | | August 21, 1998 Letter from David Clingo to Miles Waggoner with attachment | Defs. | FRE 402; FRE 802; FRE 901 |
| 21 | | | August 1998 Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 22 | | | September 1998 Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 23 | | | October 1998 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 24 | | | November 1998 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 25 | | | December 1998 Revised Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 26 | | | February 22, 1999 from DC to Waggoner; corrected December Balance sheet | Defs. | FRE 402; FRE 802; FRE 901 |
| 27 | | | January 1999 Balance Sheet & Statement. of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 28 | | | February 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 29 | | | March 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 30 | | | April 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 31 | | | May 1999 Balance Sheet | Defs. | FRE 402; FRE 802; FRE 901 |
| 32 | | | June 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 33 | | | Bayview 1999 Cost Report Protested Items | | |
| 34 | | | July 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 35 | | | August 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 36 | | | September 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 37 | | | October 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 38 | | | November 1999 Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 39 | | | February 3, 2000 from David Clingo to Miles Waggoner; Variance Analysis, Statement of Operations, Balance Sheet & Statement of Cash Flows | Defs. | FRE 402; FRE 802; FRE 901 |
| 40 | | | May 13, 1999 Facsimile from David Clingo to Sandy Morriss Re: 1998 Proposed lease expense entry | Defs. | FRE 802 |
| 41 | | | May 13, 1999 Facsimile from Sandy Morriss to David Clingo Re: lease expense entry | Defs. | FRE 403; FRE 802 |
| 42 | | | July 27, 2000 Letter from Bayview Hospital to Mutual of Omaha transmitting 1999 cost report | | |
| 43 | | | 1999 Medicare Cost Report for Bayview Hospital | | |
| 44 | | | March 3, 1999 Letter from Roy Rodriguez to Emelina Estrella, with attachments | | |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 45 | | | September 30, 1998 Memorandum from Paul Fayollat to Roy Rodriguez concerning Bayview's financial state, with attachments | | |
| 46 | | | October 7, 1998 Memorandum from Roy Rodriguez to David Clingo Re: 1998 loss | | |
| 47 | | | August 15, 1999 Facsimile from Sandy Morriss to Robert Bourseau | Defs. | FRE 402; FRE 802; FRE 901 |
| 48 | | | August 23, 1999 Facsimile from Miles Waggoner to Jim Dierker Re: CPMS borrowings from Bay View - Villa View | Defs. | FRE 402; FRE 802; FRE 901 |
| 49 | | | September 14, 1999 Letter from David Clingo to Charles Potter | Defs. | FRE 402; FRE 403; FRE 802 |
| 50 | | | November 5, 1998 Facsimile from Paul Fayollat to Sandy Morriss and David Clingo Re: Liability to Medicare through July | Defs. | FRE 802 |
| 51 | | | July 27, 1999 Letter from Chuck Jennings to Robert Bourseau Re: Transfers from Bayview | Defs. | FRE 402; FRE 802; FRE 901 |
| 52 | | | August 2, 1999 Letter from Chuck Jennings to Vince Rubio Re: Contact for fund transfers from Bayview | Defs. | FRE 402; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 53 | | | August 3, 1999 Facsimile from Vince Rubio to Chuck Jennings Re: NPSI and Bayview balances | Defs. | FRE 402; FRE 802; FRE 901 |
| 54 | | | August 9, 1999 Facsimile from Vince Rubio to Chuck Jennings Re: NPSI and Bayview balances | Defs. | FRE 402; FRE 802; FRE 901 |
| 55 | | | INTENTIONALLY LEFT BLANK | | |
| 56 | | | INTENTIONALLY LEFT BLANK | | |
| 57 | | | Map of Bayview Hospital | | |
| 58 | | | Map of Bayview Hospital | | |
| 59 | | | July 21, 2000 Paul Fayollat FBI phone transcript and recording | Defs. | FRE 403; FRE 802; FRE 901 |
| 60 | | | July 21, 2000 Robert Bourseau FBI phone transcript and recording | Defs. | FRE 403; FRE 901 |
| 61 | | | August 29, 1997 Memorandum from Paul Fayollat to Robert Bourseau Re: Bayview financial picture/operating strategies | | |
| 62 | | | July 6, 1999 Memorandum from Miles Waggoner to Don Ayers & Chuck Jennings Re: meeting with Roy Rodriguez | Defs. | FRE 402; FRE 802; FRE 901 |
| 63 | | | July 8, 1999 Letter with attachment from Robert Bourseau to Don Ayers Re: bank statements | | |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 64 | | | July 16, 1999 Letter from Chuck Jennings to Robert Bourseau re: approval necessary to transfer funds | Defs. | FRE 402; FRE 901 |
| 65 | | | August 3, 1999 Facsimile from Sandy Morriss to Robert Bourseau Re: cash needs for the week | Defs. | FRE 402; FRE 802; FRE 901 |
| 66 | | | Medicare Provider Agreement for Bayview Hospital | | |
| 67 | | | May 17, 1999 Letter from Roy Rodriguez to Jacklyn Blue re: no need for Home Office Cost Statement | Defs. | FRE 403 |
| 68 | | | June 9, 2000 Article from The San Diego Union Tribune "Poor fiscal health?" | Defs. | FRE 402; FRE 403; FRE 802 |
| 69 | | | December 12, 1997 Debtor's Fifth Amended Disclosure Statement Bk. No. LA 96-21133-SB | | |
| 70 | | | December 12, 1997 5th Amended Ch. 11 Plan | | |
| 71 | | | March 9, 1998 Order Confirming Debtor's Fifth Amended Chapter 11 Plan | | |
| 72 | | | August 7, 1998 Memorandum from Sandy Morriss to Robert Bourseau and Rudra Sabaratnam Re: private placement memo | Defs. | FRE 402; FRE 403; FRE 802 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 73 | | | February 18, 1999 Facsimile from Sandy Morriss to Paul Fayollat Re: Bayview 1997 Cost Report audit | | |
| 74 | | | November 2, 1999 Facsimile from Sandy Morriss to Robert Bourseau Re: Mutual Audit Reports | | |
| 75 | | | November 22, 1999 Facsimile from Sandy Morriss to Miles Waggoner Re: CPMS requesting NPF action | Defs. | FRE 402; FRE 802; FRE 901 |
| 76 | | | February 10, 2000 Letter from Sandy Morriss to Robert Bourseau Re: termination | Defs. | FRE 403; FRE 802 |
| 77 | | | December 4, 2000 Letter from Sandy Morriss to U.S. Trustee and Weinstein & Eisen Re: California Psychiatric Management Services, LP | Defs. | FRE 403; FRE 802; FRE 901 |
| 78 | | | November 15, 1991 First Amended and Restated Management Agreement between CPMS and South Bay | Defs. | FRE 402; FRE 403 |
| 79 | | | November 6, 1992 Letter from Robert Bourseau to Denny Bruns Re: South Bay Hospital Cost Report | Defs. | FRE 402; FRE 403; FRE 802 |
| 80 | | | January 13, 1993 Facsimile from Julie Benson to Robert Bourseau Re: Psych Ancillary costs at San Fernando and South Bay | Defs. | FRE 402; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 81 | | | Excerpts from 91-92 San Fernando and South Bay cost reports | Defs. | FRE 402; FRE 802; FRE 901 |
| 82 | | | June 18, 1993 Letter from Paul Fayollat to Denny Bruns Re: South Bay 1992 Cost Report | Defs. | FRE 402; FRE 802; FRE 901 |
| 83 | | | April 1, 1994 CPMS management contract with San Dimas Community Hospital | Defs. | FRE 402 |
| 84 | | | September 28, 1994 Letter from Robert Petrina to Steve Balalian | Defs. | FRE 402; FRE 403; FRE 901 |
| 85 | | | October 27, 1994 Letter from Robert Petrina to Steve Balalian Re: Draft agreement between South Bay and CPMS | Defs. | FRE 402; FRE 403; FRE 901 |
| 86 | | | March 13, 1995 Letter from Robert Petrina to Steve Balalian Re: potential financial impact of new contracting agreement | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 87 | | | June 19, 1995 Letter from Robert Petrina to Jean Ohl Re: Assignment of home office intermediary | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 88 | | | August 2, 1995 Letter from Jerald Happel to Robert Petrina Re: South Bay's contract with CPMS | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 89 | | | April 15, 1996 CPMS Bankruptcy Filing | Defs. | FRE 402; FRE 403 |
| 90 | | | July 26, 1996 Memorandum from Paul Fayollat to Robert Bourseau Re: 1995 CPMS Home Office Cost Statement | Defs. | FRE 402; FRE 802; FRE 901 |
| 91 | | | August 9, 1996 from Mark Smith to Robert Bourseau Re: Documentation for CPMS management fees | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 92 | | | October 4, 1996 from James Kelly to Mark Smith Re: Documentation for CPMS management fees | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 93 | | | 1994 Medicare Home Office Cost Statement for CPMS | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 94 | | | 1995 Medicare Home Office Cost Statement for CPMS | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 95  |             |               | 1996 Medicare Home Office Cost Statement for CPMS | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 96  |             |               | January 19, 1998 Memorandum from Paul Fayollat to Larry Natsume Re: CPMS management fees for Bellflower Hospital | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 97  |             |               | March 20, 1998 Amended Partnership Agreement for CPMS | | |
| 98  |             |               | May 28, 1998 Memorandum from Paul Fayollat to Robert Bourseau Re: Bayview 1997 Medicare Cost Report | | |
| 99  |             |               | May 29, 1998 Memorandum from Paul Fayollat to Robert Bourseau and Sandy Morriss Re: Revision to Bayview 1997 Medicare Cost Report | | |
| 100 |             |               | July 8, 1998 Mutual of Omaha workpapers for Bayview's 1997 Grouping of Expenses | Defs. | FRE 402; FRE 802 |
| 101 |             |               | April 1999 Loretta Masi's workpapers for W/S A-8-2 (Medical Directors) | Defs. | FRE 402; FRE 802 |
| 102 |             |               | INTENTIONALLY LEFT BLANK | | |
| 103 |             |               | May 1999 Workpaper on BV Sq. Footage W/S B-1 for Bayview's 1998 Cost Report | Defs. | FRE 802 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 104 | | | May 1999 Workpaper on BV expense groupings W/S A for Bayview's 1998 Cost Report | Defs. | FRE 802 |
| 105 | | | May 12, 1999 Loretta Masi's meeting notes | | |
| 106 | | | Exhibit 6 - Owner's /Management Personnel Compensation Exhibit submitted with Bayview's 1998 Cost Report | | |
| 107 | | | July 16, 2000 Facsimile from Paul Fayollat to Robert Bourseau Re: Bayview 1999 Cost Report | | |
| 108 | | | December 10, 2004 Facsimile from Guy Nicholson to Paul Fayollat | Defs. | FRE 402; FRE 403 |
| 109 | | | December 14, 2004 Facsimile from Paul Fayollat to Guy Nicholson | Defs. | FRE 402; FRE 403 |
| 110 | | | Medicare Cost Report and supporting papers for Los Angeles Metro Medical Center FYE 8/31/93 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 111 | | | Medicare Cost Report and supporting papers for Los Angeles Metro Medical Center FYE 8/31/94 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 112 | | | Medicare Provider Agreement for Bellflower Doctors Hospital | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 113 | | | Medicare Cost Report and supporting papers for Bellflower Doctors Hospital FYE 8/31/93 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 114 | | | Medicare Cost Report and supporting papers for Bellflower Doctors Hospital FYE 8/31/94 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 115 | | | Medicare Cost Report and supporting papers for Bellflower Doctors Hospital FYE 8/31/95 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 116 | | | CPMS Interim Agreement with San Fernando Community Hospital dated June 1, 1993 | Defs. | FRE 901 |
| 117 | | | Agreement between San Fernando Community Hospital and CPMS dated June 1, 1993 | | |
| 118 | | | Agreement between Mission Community Hospital and CPMS dated November 1, 1994 | Defs. | FRE 901 |

-14-

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 119 | | | Medicare Cost Report and supporting papers for San Fernando Community Hospital FYE 6/30/92 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 120 | | | Medicare Cost Report and supporting papers for San Fernando Community Hospital FYE 6/30/93 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 121 | | | Medicare Cost Report and supporting papers for San Fernando Community Hospital FYE 6/30/94 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 122 | | | Medicare Cost Report and supporting papers for San Fernando Community Hospital FPE 3/31/95 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 123 | | | Medicare Cost Report and supporting papers for Panorama Community Hospital FYE 6/30/94 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 124 | | | Medicare Cost Report and supporting papers for Panorama Community Hospital FPE 3/31/95 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 125 | | | Medicare Cost Report and supporting papers for Mission Community Hospital FYE 6/30/95 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 126 | | | Medicare Cost Report and supporting papers for Mission Community Hospital FYE 6/30/96 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 127 | | | April 12, 1996 Letter from Judith M. Berry to Fred Porlucas Re: Mission Community Hospital Provider Number 05-0704 FYEs 6/30/94 & 3/31/95 | Defs. | FRE 402; FRE 802; FRE 901 |
| 128 | | | INTENTIONALLY LEFT BLANK | | |
| 129 | | | Medicare Cost Report and supporting papers for South Bay Medical Center FYE 6/30/92 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 130 | | | Medicare Cost Report and supporting papers for South Bay Medical Center FYE 6/30/93 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 131 | | | Medicare Cost Report and supporting papers for South Bay Medical Center FYE 6/30/94 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 132 | | | Medicare Cost Report and supporting papers for South Bay Medical Center FYE 6/30/95 | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 133 | | | Medicare Cost Report and supporting papers for South Bay Medical Center FYE 6/30/96 | Defs. | FRE 402; FRE 802; FRE 901 |
| 134 | | | 1994 Draft Management Agreement between South Bay Medical Center and CPMS | Defs. | FRE 901 |
| 135 | | | September 8, 1997 Memorandum from Loretta Masi to Paul Fayollat Re: Bayview 1994 Medicare audit adjustments | Defs. | FRE 402; FRE 802; FRE 901 |
| 136 | | | Workpaper on expense groupings for Bayview's 1999 Medicare Cost Report | Defs. | FRE 802; FRE 901 |
| 137 | | | Revenues & summary trial balance for Bayview Hospital FY 99 | Defs. | FRE 802; FRE 901 |
| 138 | | | Excerpts from HCFA form 339 submitted with Bayview's 1998 Medicare Cost Report | Defs. | FRE 802; FRE 901 |
| 139 | | | Expert Report of Kathy McNamara | Defs. | FRE 703; FRE 802 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 140 | | | Stark II Proposed Rule, Federal Register Vol. 63, No 6 dated Friday January 9, 1998 | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent , if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court |
| 141 | | | Treasury Regulation 162-7(b) (3) | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 142 | | | January 27, 1998 Independent Contractor Agreement between IIA and CPMS | Defs. | FRE 402 |
| 143 | | | March 1, 1998 Independent Contractor Agreement between RIB Medical Management Services, Inc. and Bayview Hospital | | |
| 144 | | | March 1, 1998 Independent Contractor Agreement between Navatkuda, Inc. and Bayview Hospital | | |
| 145 | | | Renal Physicians Association-Position paper " The Nephrologist as a Dialysis Center Medical Director." | Defs. | FRE 402; FRE 403 |
| 146 | | | 1999 Villa View agreement with RIB | Defs. | FRE 402 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 147 | | | 1999 Villa View agreement with Navatkuda | Defs. | FRE 402 |
| 148 | | | April 22, 1998 Bayview Hospital Governing Board Minutes | | |
| 149 | | | March 1998 Bayview Hospital Governing Board Minutes | | |
| 150 | | | September 9, 1998 Bayview Hospital Governing Board signature sheet | | |
| 151 | | | August 3, 1998 Bayview Hospital Governing Board Minutes | | |
| 152 | | | June 29, 1998 Bayview Hospital Governing Board Minutes | | |
| 153 | | | Expert Report of Charles Potter | Defs. | FRE 703; FRE 802 |
| 154 | | | PRM CMS Pub. 15-1 §202 Interest Expense Definitions | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 155 | | | PRM CMS Pub. 15-1 §219 Accounts Receivable Financing | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 156 | | | PRM CMS Pub. 15-1 §2103 Prudent Buyer | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 157 | | | PRM CMS Pub. 15-1 §2135 Purchased Management and Administrative Support Services | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 158 | | | PRM CMS Pub. 15-1 §2150 Home Office Costs – Chain Organizations | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 159 | | | PRM CMS Pub. 15-1 §2305 Liquidation of Liabilities | Defs. | Defendants object to this exhibit on the grounds that statutory and/or regulatory provisions are not "evidence" and therefore are not admissible at trial for any purpose. Such provisions only pertinent, if at all, at the conclusion of the trial when the parties are submitting proposed jury instructions to the Court. |
| 160 | | | September 10, 2001 Letter from Perlman & Associates in response to HHS-OIG subpoena served on NCFE | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 161 | | | September 1, 2001 Letter from Paul Fayollat & Associates, Inc. in response to HHS-OIG subpoena | Defs. | FRE 402; FRE 403; FRE 901 |
| 162 | | | August 30, 2001 Letter from Joseph D. Epps Re: National Psychiatric Services, Inc. And Affiliated Organizations | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 163 | | | August 30, 2001 Letter from Weinstein, Eisen & Weiss Re: California Psychiatric Management Services, Debtor | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 164 | | | January 16, 2002 Letter from Tenet in response to HHS-OIG subpoena | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 165 | | | August 9, 2001 Subpoena with cover letter to Manufacturers Bank | Defs. | FRE 402; FRE 403; FRE 901 |
| 166 | | | August 9, 2001 Subpoena with cover letter to National Century Financial Enterprises | Defs. | FRE 402; FRE 403; FRE 901 |
| 167 | | | August 9, 2001 Subpoena with cover letter to TF Funding, LLC | Defs. | FRE 402; FRE 403; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 168 | | | August 9, 2001 Subpoena with cover letter to Tenet Healthcare Corporation | Defs. | FRE 402; FRE 403; FRE 901 |
| 169 | | | August 9, 2001 Subpoena with cover letter to Ross Loos Medical Center | Defs. | FRE 402; FRE 403; FRE 901 |
| 170 | | | September 19, 2001 Subpoena with cover letter to PHM, Inc. | Defs. | FRE 402; FRE 403; FRE 901 |
| 171 | | | August 20, 2001 Declaration accompanying Wells Fargo Bank response to subpoena | Defs. | FRE 402; FRE 403; FRE 901 |
| 172 | | | August 9, 2001 Subpoena to Wells Fargo Bank | Defs. | FRE 402; FRE 403; FRE 901 |
| 173 | | | September 6, 2001 Letter from Robert L. Berger & Associates in response to HHS-OIG subpoena | Defs. | FRE 402; FRE 403; FRE 901 |
| 174 | | | August 9, 2001 Subpoena to Robert L. Berger & Associates | Defs. | FRE 402; FRE 403; FRE 901 |
| 175 | | | August 28, 2001 Letter from Titan Management, L.P. in response to HHS-OIG subpoena | Defs. | FRE 402; FRE 403; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 176 | | | August 9, 2001 Subpoena to Titan Management, L.P. | Defs. | FRE 402; FRE 403; FRE 901 |
| 177 | | | October 15, 2001 Letter from PHM, Inc. in response to HHS-OIG subpoena | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 178 | | | January 27, 2005 Subpoena with cover letter to Alberta Stahl, Chapter 7 Trustee c/o Ross Gonzalez, Esq. | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 179 | | | September 13, 2001 Letter from Perlman & Associates in response to HHS-OIG subpoena served on NCFE | Defs. | FRE 402; FRE 403; FRE 901 |
| 180 | | | November 20, 2001 Letter from Perlman & Associates in response to HHS-OIG subpoena served on NCFE | Defs. | FRE 402; FRE 403; FRE 901 |
| 181 | | | December 6, 2001 Letter from Perlman & Associates in response to HHS-OIG subpoena served on NCFE | Defs. | FRE 402; FRE 403; FRE 901 |
| 182 | | | Complaint | Defs. | Defendants object to this exhibit on the grounds that pleadings are not "evidence" and therefore are not admissible at trial for any purpose. |
| 183 | | | Answer | Defs. | Defendants object to this exhibit on the grounds that pleadings are not "evidence" and therefore are not admissible at trial for any purpose. |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 184 | | | Defendants' (Robert Bourseau and RIB Medical Management) Responses to Plaintiff's First Set of Interrogatories | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 185 | | | Defendants' (Rudra Sabaratnam and Navatkuda, Inc.) Responses to Plaintiff's First Set of Interrogatories | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 186 | | | Defendants' Responses to Plaintiff's Second Set of Interrogatories | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 187 | | | Defendants' Responses to Plaintiff's First Set of Requests for Admission | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 188 | | | Defendants' (Robert Bourseau and RIB Medical Management) Responses to Plaintiff's First Request for the Production of Documents | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 189 | | | Defendants' (Rudra Sabaratnam and Navatkuda, Inc.) Responses to Plaintiff's First Request for the Production of Documents | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 190 | | | Defendants' Responses to Plaintiff's Second Request for the Production of Documents | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 191 | | | Defendants' Responses to Plaintiff's Third Request for the Production of Documents | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 192 | | | Defendants' Supplemental Responses to Plaintiff's Third Request for the Production of Documents | Defs. | Defendants object to this exhibit on the ground that while discovery responses may be orally introduced at the time of trial, the actual responses themselves are not "evidence" and are therefore not admissible at trial. |
| 193 | | | Expert Report of Kathleen K. Walker | Defs. | FRE 703; FRE 802 |
| 194 | | | December 31, 1998 Letter from Emelina Estrella to Paul Fayollat Re: Ingleside 1997 audit adjustment report | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 195 | | | 1997 Medicare Cost Report for Ingleside Hospital | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 196 | | | 1998 Medicare Cost Report for Ingleside Hospital | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 197 | | | 1999 Medicare Cost Report for Ingleside Hospital | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 198 | | | August 14, 2001 Objection to Motion for Order Approving Asset Purchase Agreement and Approving the Sale of the Debtor's Assets free and Clear of All Liens, Claims and Interest ; Declaration of Robert I. Bourseau in Support Thereof | Defs. | FRE 402; FRE 403 |
| 199 | | | January 25, 2002 Letter from Lance Poulsen to Robin Cowles Re: Hellman loan | Defs. | FRE 402; FRE 802; FRE 901 |
| 200 | | | January 25, 2002 Letter from Lance Poulsen to Robin Cowles Re: Ross Loos loan | Defs. | FRE 402; FRE 802; FRE 901 |
| 201 | | | June 11, 2002 Declaration of Robert Bourseau in Support of Opposition to Objection of NCFE to the Committee's Motion to Compromise | Defs. | FRE 402; FRE 403 |
| 202 | | | August 18, 2003 Outline of distribution of proceeds from Ross Loos Loan | Defs. | FRE 402; FRE 802; FRE 901 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| 203 | | | October 7, 2003 Notice of Motion and Motion for a Preliminary Injunction Against NPF Capital, Inc.; Memorandum of Points and Authorities and Declaration of Robert I. Bourseau in Support Thereof | Defs. | FRE 402; FRE 403 |
| 204 | | | Pre-Judgment Interest Amount (Exhibit to be provided at trial) | Defs. | Exhibit not provided. |
| 205 | | | June 2, 1993 Closing Binder, NPFII-W, Inc. Health Care Receivables Funding Notes | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 206 | | | November 14, 1994 Closing Binder, NPFII-W Health Care Receivables Funding Notes | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 207 | | | January 2, 1996 Closing Binder NPF VI, Inc. CPMS dba Bayview | Defs. | FRE 402; FRE 403; FRE 802; FRE 901 |
| 208 | | | Federal Income Tax Return for RIB Medical Management Services, Inc. and supporting papers for FY 1998 | Defs. | FRE 402; FRE 403 |
| 209 | | | Federal Income Tax Return for RIB Medical Management Services, Inc. and supporting papers for FY 1999 | Defs. | FRE 402; FRE 403 |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| 210 | | | Federal Income Tax Return for Navatkuda, Inc. and supporting papers for FY 1998 | Defs. | FRE 402; FRE 403 |
| 211 | | | Federal Income Tax Return for Navatkuda, Inc. and supporting papers for FY 1999 | Defs. | FRE 402; FRE 403 |
| 212 | | | Federal Income Tax Return for CPMS and supporting papers for FY 1998 | Defs. | FRE 402; FRE 403 |
| 213 | | | Federal Income Tax Return for CPMS and supporting papers for FY 1999 | Defs. | FRE 402; FRE 403 |
| 214 | | | Federal Income Tax Return for CPMS and supporting papers for FY 2000 | Defs. | FRE 402; FRE 403 |
| 215 | | | June 8, 2000 Letter from Jim Dierker to Robert Bourseau | | |
| 216 | | | PRM CMS Pub. 15-1 § 2409 Overpayments to Providers | | |

Defendant's Exhibit List

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|---|---|---|---|---|---|
| A | | | Partial floor plan for Bayview Hospital & Mental Health Systems ("Bayview") [USABOU 002405] | | |
| B | | | January 1, 1994 Independent Contractor Agreement between California Psychiatric Management Services ("CPMS") and RIB Medical Management Services, Inc. ("RIB") [USABOU 023891A-023893] | US | FRE 402, 403 |
| C | | | January 1, 1994 Independent Contractor Agreement between CPMS and Navatkuda, Inc. ("Navatkuda") [USABOU 023895-023897] | US | FRE 402, 403 |
| D | | | May 28, 1998 memorandum from Paul Fayollat to Robert Bourseau [USABOU 000155-000157] | | |
| E | | | May 28, 1998 memorandum from National Century Financial Enterprises, Inc. ("NCFE") to Pacific Hospital Management ("PHM") [USABOU 002552-002555] | | |
| F | | | May 29, 1998 memorandum from Paul Fayollat to Robert Bourseau [USABOU 000154] | | |

| No. | Date Marked | Date Admitted | Description | Objecting Party | Basis for Objection |
|-----|-------------|---------------|-------------|-----------------|---------------------|
| G | | | May 29, 1998 letter from Loretta Masi to Mutual of Omaha ("Mutual") [USABOU100002] | | |
| H | | | 1997 Bayview Medicare Cost Report [USABOU 007541-007593] | | |
| I | | | February 25, 1999 letter from Roy Rodriquez to Emelina Estrella [USABOU 001024-001025] | | |
| J | | | March 3, 1999 letter from Roy Rodriquez to Emelina Estrella [USABOU 000788-000795] | | |
| K | | | June 15, 1999 letter to Mutual [USABOU 000721-000722] | | |
| L | | | 1998 Bayview Medicare Cost Report [USABOU 008636-008704] | | |
| M | | | July 27, 2000 letter to Mutual [USABOU 000724] | | |
| N | | | 1999 Bayview Medicare Cost Report [USABOU 0080321; 025679-025746] | | |